# 23-6877(L), 23-6925(CON)

## United States Court of Appeals

*for the*

## Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

GARY DENKBERG, SEAN NOVIS,

*Defendant-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANT-APPELLANT GARY DENKBERG

---

MATTHEW W. BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorney for Defendant-Appellant*
 *Gary Denkberg*
666 Old Country Road, Suite 501
Garden City, New York 11530
516-683-8500

## **<u>TABLE OF CONTENTS</u>**

STATEMENT OF JURISDICTION…………………………………………1

PRELIMINARY STATEMENT……………………………………………...1

ISSUES PRESENTED...................................................................................4

STATEMENT OF FACTS............................................................................5

SUMMARY OF ARGUMENT………………………………………… 30

ARGUMENT................................................................................... 31

    I.    THE COURT'S ERRONEOUS SUPPLEMENTAL INSTRUCTION
        DEPRIVED THE DEFENDANTS OF A FAIR TRIAL………………... 31

        A. The Supplemental Instruction Improperly Charged the
           Jury that Defendants Could Not Rely Upon Advice of
           Counsel If They Knew That Their Promotions
           Contained *Non-Material* Misrepresentations……………….. 33

        B. The Supplemental Charge Was Unbalanced and
           Prejudicial Because It Failed to Instruct the Jury
           as to the Element of Materiality……………………………. 37

    II.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO
        SUSTAIN THE JURY'S VERDICT………………………………...40

        A. The Evidence Was Legally Insufficient to Support
           the Jury's Verdict with Respect to Counts One
           Through Fifteen, Because the Evidence Demonstrates
           that Gary Denkberg Relied Upon the Advice of
           Counsel in Operating His Business…………………………41

           1. The Defendant, in Good Faith, Sought Out the
               Advice of Competent Attorneys Before Taking
               Action…………………………………………………42

i

2. Defendant Consulted with Counsel for the Purpose of Securing Advice on the Lawfulness of His Future Conduct……………………………………… 43

3. Defendant Made a Full and Accurate Report to His Attorney of All Material Facts He Knew……………46

4. The Defendant Acted Strictly in Accordance with the Advice of His Attorney………………………… 48

B. The Evidence Failed to Prove That Denkberg Aided and Abetted Phillips, Priolo, or Jeffrey Novis in the Commission of a Crime………………………………...50

III. THE LOWER COURT ERRED IN PRECLUDING DEFENSE COUNSEL FROM INTRODUCING EXCULPATORY EVIDENCE RELEVANT TO THE AIDING AND ABETTING COUNTS…………….. 52

IV. ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PROVIDE TIMELY NOTICE OF HIS INTENT TO USE THE DOCUMENTS………………………………...58

V. APPELLANT JOINS IN THE ARGUMENTS OF CO-DEFENDANT SEAN NOVIS TO THE EXTENT APPLICABLE………………………60

CONCLUSION................................................................................................ 61

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Arroyo v. Jones*, 685 F.2d 35 (2d Cir. 1982)………………………………………….31

*Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967)……...57

*Clinkscale v. Carter,* 375 F.3d 430 (6th Cir. 2004)………………………………...60

*Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142 (1986)…………………………52

*Harrison v. Cunningham*, 512 F. App'x 40 (2d Cir. 2013)…………………………60

*Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727 (2006)…………………53

*Gilmore v. Henderson*, 825 F.2d 663 (2d Cir. 1987)………………………………57

*MacNaughton v. Young Living Essential Oils*, LC, 67 F.4th 89 (2d Cir. 2023)…….34

*Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827 (1999)………………………..38

*Noble v. Kelly*, 246 F.3d 93(2d Cir.),
*cert. denied*, 534 U.S. 886, 122 S. Ct. 197, 151 L. Ed. 2d 139 (2001)……………54

*Rosario v. Ercole*, 601 F.3d 118 (2010)……………………………………………59

*Rosemond v. United States*, 572 U.S. 65, 134 S. Ct. 1240 (2014)…………………50

*Stewart v. Wolfenbarger,* 468 F.3d 338 (6th Cir. 2006)……………………………60

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,
80 L. Ed. 2d 674 (1984)……………………………………………………………58

*Sussman v. Jenkins,* 636 F.3d 329 (7th Cir. 2011)…………………………………60

*Taylor v. Illinois*, 484 U.S. 400, 108 S. Ct. 646 (1988)………………..53, 54, 57, 58

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)………..33

*United States v. Brown*, 544 F.2d 1155 (2d Cir. 1976)………………………32, 37

*United States v. Costa*,
423 Fed. Appx. 5, 7, 2011 U.S. App. LEXIS 10307 (2d Cir. 2011)……………...59

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)……………………………41

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016)……………………..31, 39

*United States v. Kopstein*, 759 F.3d 168 (2d Cir. 2014)………………………32, 39

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018)………………………………35

*United States v. Matos,* 905 F.2d 30 (2d Cir. 1990)………………………………59

*United States v. Phillips*, 21-CR-566 (EDNY)………………………………………..9

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017)…………………………..37, 41

*United States v. Velez*, 652 F.2d 258 (2d Cir. 1981)………………………………..31

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017)…………………………..38, 39

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000)……………………………59

*Uzoukwu v. City of N.Y.*, 805 F.3d 409 (2d Cir. 2015)……………………………40

*Williamson v. United States*, 207 U.S. 425, 28 S. Ct. 163 (1908)…….34, 35, 42, 44

**<u>Other Authorities</u>**

Title 28 U.S.C. § 1291……………………………………………………………...1

## STATEMENT OF JURISDICTION

Defendant-Appellant Gary Denkberg appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York. Mr. Denkberg was convicted, after trial, of Conspiracy to Commit Mail Fraud, and multiple counts of Mail Fraud, Wire Fraud, Mail Fraud Using Fictious Names or Titles, and Aiding and Abetting Mail Fraud. Sentence was imposed by the Honorable Joan M. Azrack on August 2, 2023, and Judgment was entered the following day. On August 7, 2023, the Defendant filed a timely Notice of Appeal. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## PRELIMINARY STATEMENT

The Appellant and his partner, Sean Novis, operated a direct mail business which sent out mass mailings to prospective customers. Those mailings offered customers the opportunity to purchase a booklet compiling "sweepstake opportunities" – current information concerning prize contests open to the public. The mailings took the form of official looking documents, addressed to the recipient with seals, signatures and enthusiastic descriptions of a "guaranteed" or "verified" "CASH/PRIZE-Win Opportunity." However, the forms also included detailed disclaimers, noting that the recipient had not, in fact, won anything, and was being solicited to purchase information concerning available sweepstakes.

1

All such promotions were vetted, edited, and approved by counsel prior to being sent out. Over the course of thirteen years, counsel consistently advised the Defendants that their promotions were lawful, insofar as they would not have the effect of deceiving a reasonable person.

Notwithstanding such advice, in 2020 Mr. Denkberg and Mr. Novis were indicted on fraud charges. When it became clear that the Defendants would advance an advice-of-counsel defense, prosecutors responded with a superseding indictment, charging the Defendants with aiding and abetting third parties in their operation of similar direct mail businesses. In particular, the Government asserted that Denkberg and Novis had shared mailing lists and provided administrative assistance to Novis's father (Jeffrey Novis) and two other individuals, who were operating their own direct mail businesses.

This maneuver was intended to foreclose the advice-of-counsel defense, insofar as Mr. Denkberg and Mr. Novis were not privy to the legal advice sought and received by these third parties. Simultaneously, prosecutors charged Jeffrey Novis and his associates in a separate indictment, making such individuals unavailable as witnesses.

In November of 2021, the Government produced to defense counsel over 100,000 pages of email communications that had been subpoenaed from the third parties' email providers, and which were being reviewed by a Government "taint

team" for potential privilege issues. Such documents were produced pursuant to a protective order which required defense counsel to notify the Government and the Court twenty-one days prior to trial if Defendants intended to use such documents.

At trial, the Government introduced evidence that the Defendants' mailings were confusing to extremely elderly victims, and that the Defendants received customer complaints which placed them on notice of this fact.

The Defendants called their attorney, who testified concerning the advice which he rendered to the Defendants, and his belief that such mailings were lawful insofar as they would not mislead a reasonable consumer.

Finally, counsel for Denkberg sought to introduce a binder of email communications relating to advice sought and received by the third parties in connection with the promotions underlying the aiding and abetting counts. The Government objected on the grounds that counsel had failed to comply with the twenty-one-day notice provision contained in the protective order. Defense counsel explained that he had only recently discovered the exculpatory material contained in the large production, and blamed the Government for failing to provide express notice of the *Brady* material. The district court precluded counsel from introducing the third-party emails.

At the close of trial, the district court charged the jury as to applicable law, including the advice-of-counsel defense. It further charged the jury that the Government was required to prove a material misrepresentation – one which a reasonable and prudent person would rely upon in making a decision.

After a period of deliberation, the jury asked for clarification as to the phrase "person of average prudence," and further inquired whether a person could be purposefully misleading "but not have intent to break the law as advice of counsel said they were in the law."

In response, the district court instructed the jury – over defense counsel's objection – that a person who acts with an intent to deceive for the purpose of causing some financial loss cannot rely upon the advice-of-counsel defense. It further instructed the jury that the Government need not prove an intent to deceive persons of ordinary prudence, and that it was sufficient to show "the defendant intended to deceive the ignorant and gullible."

The jury thereafter returned a verdict, convicting Denkberg on thirteen of the nineteen counts in the indictment.

## ISSUES PRESENTED

In light of the above factual background, the instant appeal presents the following questions:

1)      Was the trial evidence sufficient to support the jury's verdict, where it demonstrated that the Appellant was consistently counseled that his mailings were lawful, insofar as they would not be materially misleading to a reasonable consumer?

2)      Was the Appellant prejudiced by the lower court's supplemental instruction, which informed the jury that Appellant could not rely on the advice-of-counsel defense if he possessed an intent to deceive *any* person, no matter how "ignorant or gullible"?

3)      Did the lower court err in precluding defense counsel from introducing exculpatory evidence, based upon his failure to provide timely notice under the protective order, where there was no evidence that such failure was willful?

4)      Alternatively, was defense counsel ineffective in failing to timely notify prosecutors of his intention to use such information at trial?

## STATEMENT OF FACTS

### I.      THE DEFENDANTS' BUSINESS

In approximately 2000, Sean Novis started a business operating in the direct mail industry; several years later he was joined by Mr. Denkberg. TR 500-501.

The Defendants' businesses sent out bulk promotional mailings. The basic business model involved the sale of booklets compiling information concerning publicly available sweepstake opportunities. Customers were solicited to send in relatively small payments (typically in the range of $20); all customers who mailed

5

in such payments received a pamphlet containing up-to-date sweepstakes information.  TR 533-535; *see also* GX 159.

Defendants used DBAs for marketing purposes, mailing out solicitations using names like "Jackpot Express" and "The Report Center."  TR 902; 1017-1018. Such mailings frequently bore what appeared to be the signature of an official at the DBA; in reality, no such person existed.  TR 1536.  These promotional mailings included official looking seals, and informed recipients, in breathless and sometimes convoluted language, about large "award" or "win" "opportunities."  *See e.g.*, GX 100, 132.

However, such mailings simultaneously included lengthy disclaimers that expressly informed recipients that they had not, in fact, won anything, and that they were being solicited to purchase a newsletter compiling various sweepstakes opportunities.  *See id*.

From the start of his involvement, Denkberg insisted that all promotional materials be reviewed and approved by counsel before being sent out.  TR 263, 279, 285-86; 1527.  In particular, Denkberg and Novis relied on two law firms – the law offices of Charles Chernofsky, and the Lustigman Firm, both of which specialized in counseling direct-mail businesses.  In many cases, the Defendant had *both* firms review his promotions at different times to assure legal compliance.  TR 1513.  Any changes suggested by counsel were incorporated into the mailings.  TR 264.

Thereafter, the revised promotions were sent *back* to counsel for a final review, to ensure compliance.  TR 264, 615.

From time to time, the businesses received complaints – either from customers or from consumer protection entities.  All such complaints were forwarded to counsel for review and response.  TR 622; 627; 1525-1526.  Any customer who requested a refund was provided with one.  TR 604; 1519.

Denkberg was repeatedly assured by his attorneys that he was operating within the law.  Over the course of thirteen years, Denkberg was told by multiple attorneys that the legality of his company's mailings was dictated by the "reasonable consumer" standard.  TR 1518, 1528, 1555-56.  Such attorneys repeatedly opined that, given the specific language suggested by counsel, and the extensive disclaimers contained in his promotions, no "reasonable consumer" would be deceived by Denkberg's mailings.

Despite this advice, in 2011, the United States Postal Service brought a civil suit against the Defendants' businesses under the "False Representation and Lottery" statue, 39 U.S.C. § 3005.  The Lustigman Firm represented the Defendants in connection with the ensuing negotiations.  The result of those negotiations was a consent order, executed in April of 2012, whereby the Defendants' companies agreed to cease doing business and pay a penalty of $5,000, without any admission of wrongdoing.  TR 371-390.  While the consent order did not bar Defendants from

participating in the direct-mail business, it did prohibit them from engaging in future conduct deemed to be fraudulent by the Postal Service.  TR 390.

Thereafter, in consultation with Mr. Lustigman, Denkberg and Novis formed new corporations and created revised promotions.  In particular, Novis formed a corporation called Quantum Marketing, Inc., while Denkberg and Novis together formed Horizon Marketing Services, Inc.  TR 616-617.

As a result of the postal agreement, the standards applicable to these new entities were tightened, with special attention given to the provisions of the consent order.  TR 1522-23.  On multiple occasions, Denkberg asked counsel to re-review promotions to confirm that they were in compliance with the consent order.  Again, all suggested changes were incorporated into the promotions.

In September of 2016, the Postal Service brought another civil action against the Defendants and obtained a cease and desist order; at the same time, a search warrant was executed at the Defendants' office.  TR 426-427; TR 921.  The Defendants thereafter ceased operating their businesses.

## II.  INDICTMENT

Approximately four years after their businesses had been shuttered, Gary Denkberg and Sean Novis were indicted on multiple fraud-related counts.  The initial indictment charged both Defendants with Conspiracy to Commit Mail Fraud, Mail Fraud, and Wire Fraud.  *See* Indictment, ECF 1.

It quickly became evident that Messrs. Denkberg and Novis would advance an advice-of-counsel defense. Indeed, the Defendants waived their privilege and provided prosecutors with full access to their attorney-client communications. TR 1070; 1529.

In response to this development, prosecutors filed a superseding indictment. The new indictment, filed in August of 2021, added four counts of Aiding and Abetting Mail Fraud. These aiding and abetting charges were based upon allegations that the Defendants assisted three other individuals who were operating similar direct-mail businesses – Shawn Phillips, Philip Priolo, and Jeffrey Novis (Sean Novis's father). *See* Superseding Indictment, ECF 33. On November 9, 2021, the Government charged Phillips, Priolo, and Jeffrey Novis under a separate indictment; that matter is still pending. *See United States v. Phillips*, 21-CR-566 (EDNY).

## III. PROTECTIVE ORDER

Trial in the Defendants' case was initially scheduled for January of 2022. In October of 2021, defense counsel filed a discovery demand, seeking any evidence tending to show that Phillips, Priolo, and Jeffrey Novis had obtained advice of counsel in connection with their own promotions. ECF 40.

On November 10, 2021, the Government moved for a protective order covering documents gathered by prosecutors in the *Phillips* case. ECF 43. The Government explained that search warrants issued in the *Phillips* case had yielded

some "65,000 parent email threads," which were being reviewed by a separate taint team for potentially privileged communications. It represented to the court that this privilege review would take "a number of weeks," and that in the interim, prosecutors on the trial team would not be able to view such documents. *Id*.

Accordingly, prosecutors proposed turning over such communications to Denkberg and Novis, on the condition that defense counsel alert the Government twenty-one days prior to trial if they intended to use such communication. The district court signed the protective order. *See* Motion and Protective Order, ECF 43 and 44.

## IV.  TRIAL

### A.  Government Case

Trial did not actually commence in January; instead, it was adjourned until April 2022. At trial, the Government called twenty witnesses, who generally fell within one of three categories: alleged victims, postal inspectors, and individuals who worked for or with the Defendants. The material testimony is summarized below.

#### 1.  Victim Testimony

The evidence established that over the course of thirteen years, the Defendants sent out their promotions to hundreds of thousands of customers across the country. Of this massive pool of potential witnesses, the Government hand-selected six

extremely aged victims (and/or their family members) to testify that they were confused and deceived by the Defendants' mailings. *See* TR 77-99; 312-337; 337-360; 459-485; 587-591. Indeed, of the six alleged victims, only two were capable of actually testifying; and one of *those* victims – 93-year-old Paul Murrell – was permitted to testify by Zoom because he was unable to travel. TR 77. Two of the Government's chosen victims – Harry Ranker and John Single – were deceased. TR 312; 337. And the remaining two victims – Wendell Brooks and Art Montilla – suffered from cognitive issues which prevented them from taking the stand. TR 459; 549.

Hence, with respect to four of the six victims, the Government was permitted to call family members to testify as to their observations and statements made by the victims. TR 312; 337; 459; 549. In each case, the Government elicited testimony that the elderly victims were confused by the promotional mailings, and sent money to the Defendants' businesses believing that they had won a significant cash prize.

2. <u>Postal Inspector Employees</u>

The Government called three witnesses who were employed by the United States Postal Service.

Patricia Edgehille, an Inspector Attorney with the Postal Inspection Service, testified concerning the 2011 civil action brought against the Defendants and their predecessor entities. Through Ms. Edgehille, the Government introduced copies of

11

the 2012 consent order executed by the parties. *See* GX 14. That consent order, while not barring the Defendant from operating a direct-mail business, and containing no admission of wrongdoing, prohibited Defendants from engaging in specific deceitful promotional activities described in the consent order. TR 390; 451.

The Government also called Richard Cinnamo, a retired postal inspector who testified concerning the September 2016 search of the Defendants' office, which resulted in the seizure of computers, cash, paperwork, and a banker's box of customer complaints. TR 921-952.

Finally, the Government called postal inspector Nichole Rodriguez, who reviewed records in connection with the case and prepared summary charts. TR 953-1033. Those summary charts purported to show that from 2003 to 2013, the Defendants various businesses grossed $77.5 million in customer payments. TR 992-998; GX 654.

3.   <u>Employees and Agents of the Company</u>

The Government called five witnesses who either worked for or with the Defendants: Cheryly Jaquard, Ellen McDevitt, Mary Lilienkamp, Thomas Ressler, and Adam Solomon.

a)    *Cheryly Jaquard*

Ms. Jacquard, the Defendants' production manager, explained the basic structure and operation of the business.  TR 104-306.  Promotions were designed and/or vetted in-house, before being sent out to a letter shop for printing and mailing, pursuant to pre-determined schedules.  TR 110-111.  Promotions were typically mailed to anywhere between 5,000 and 25,000 addresses.  TR 111.

Mailings were done in phases.  A "front end piece" – which consisted of an initial large-scale mailing typically went out once per month.  TR 137.  The business would then use the responses to create a refined list of interested consumers, who would receive 10 to 12 "back end" mailings.  TR 139.  Each back-end mailing was assigned a three-letter code corresponding to the name of the promotion.  TR 195.

Incoming monies were handled in the business' "caging department," where envelopes were opened and inventoried for checks, cash, and money orders.  TR 142.  Payment processing was handled by an external vendor called PacNet.  TR 143.

All customers who sent in money received a "fulfillment package" which consisted of a booklet with up-to-date sweepstakes opportunities.  TR 143; *see* GX 159.  The total amount of available sweepstake opportunities always equaled or exceeded the amounts described in the Defendants' promotions.  TR 148; *see also* TR 535.

Ms. Jacquard testified that all promotions were reviewed by counsel and edited *per* counsel's direction. TR 263-264; 279. She further noted that the payment processor, PacNet, had its own compliance program and would also review the language of mailings to assure they met applicable legal standards. TR 297. Ms. Jacquard told investigators that she believed the business was legitimately selling promotions booklets, and that its customers were actually interested in receiving such materials. TR 282-283; 292. She further testified that in the wake of the 2011 consent order, all mailings were taken out of production for review, and that every piece was changed to assure compliance. TR 289; 299-300.

    b)    *Ellen McDevitt*

Ellen McDevitt testified about the operation of the caging department and accounting. McDevitt testified that up until 2015, caging operations were handled by a nominally distinct entity called EC Logistics. TR 506-508. In reality, however, EC Logistics was created and controlled by Sean Novis; the witness was unaware if Denkberg played any role in its operation. TR 504; 506; 508. After 2015, caging operations were taken over by a business called Precise Services, LLC, which was managed by a former employee, and which operated off-site. TR 508, 601, 617.

Ms. McDevitt testified that, at the direction of Mr. Novis, EC Logistics provided caging and administrative services to several other direct mailing business, including "Lakeside," "Parkside," "Winner's Circle" and the "Feel Lucky Group."

14

TR 520-521. The former two were operated by an individual named Sean Phillips; the latter two were operated by Mr. Novis's father – Jeffrey Novis – and his business partner Philip Prilolo. TR 519-521. McDevitt testified that these outside businesses were "very similar" to the Defendants' business. TR 520.

Like Ms. Jacquard, McDevitt confirmed that all the Defendant's promotions were reviewed and marked-up by counsel, and that refunds were always provided upon request. TR 613-615. She further confirmed that PacNet had its own compliance department (TR 630), and that all customer complaints were provided to counsel. TR 622. After the 2012 consent order, McDevitt testified that the attorney-review process became "even stricter." TR 609; 623.

   c)   *Mary Lilienkamp*

Mary Lilienkamp, a thirty-year veteran of the direct mail industry, testified that she performed data processing for the Defendants. TR 640-705. Ms. Lilienkamp explained how she utilized responses from the front-end mailings to create back-end mailings, with a database of names and addresses. TR 644-646. Like McDevitt, she testified that she also did work for Priolo, Phillips, and Jeff Novis, at the request of Sean Novis. TR 648. She further testified that Priolo, Phillips, Jeff Novis, Sean Novis, and Gary Denkberg shared customer lists with each other. TR 649.

15

d)    *Thomas Ressler*

The Government called Thomas Ressler, a graphic designer, to testify regarding his work in the direct-mail industry generally, and for the Defendants specifically. Ressler testified that he started creating sweepstake promotions in the mid-1990s. TR 762. At some point (Ressler did not recall the date), he was contacted by Sean Novis to design mailings; he dealt exclusively with Novis. TR 772-773.

Ressler testified it was his goal to make promotions "look and sound as attractive, enticing, and entertaining as [he] could" and that the promotions would then "pass from my hands into the lawyers' hands for correcting and editing." TR 745. Ressler employed artistic elements – "scripophily" and "guilloche" – to "lend credibility" and to create a "unique look." TR 746; 777. He testified that it was his intention to create an impression that the recipient had already won a prize (TR 775), and to distract away from the legal disclosure paragraphs. TR 778. In furtherance of this goal, Ressler testified that he used confusing language (TR 780) and designed the mailings to look "official." TR 782.

On cross examination, Ressler conceded that Sean Novis arranged for the Defendants' attorney to meet with Ressler at his home, in order to review and dictate changes to the artists' promotion – a level of supervision which he agreed was "unusual." TR 803.

16

e)    *Adam Solomon*

Finally, the Government called Adam Solomon, an attorney who had, at one time, worked at the Lustigman Firm and done work reviewing the Defendants' promotions.  The Government called Mr. Solomon for the ostensible purpose of establishing that the Defendants hid material information from counsel when seeking legal advice.  Most notably, Solomon claimed he was entirely unaware of the 2011 civil suit brought by the Postal Service, despite the fact that his firm had represented the Defendants in that matter.  TR 867.  Solomon further maintained that he was unaware of the resulting 2012 consent order.  TR 870.  Solomon claimed that if he had known of the consent order, it would have altered the manner in which he reviewed Defendants' promotions.  TR 872.

On cross examination, Solomon was confronted with email after email which he received from Gary Denkberg, expressly asking him to review the Defendants' promotions to assure compliance with the "postal agreement."  TR 883-884; 1041-1049; *see also* D-X, D-C1, D-D1, D-E1, D-F1.  The witness claimed that he never asked anyone what "postal agreement" his client was referring to.  TR 899-901.

The witness conceded that he advised Denkberg that all of his mailings were legal insofar as they would not be deceptive to a "reasonable person."  TR 1066-68; 1078.  He knew that the promotions were in the names of DBA's and used a fictional "signatory title," but did not believe that affected their legality; Solomon never

17

advised the Defendants that this practice was improper. TR 1040-1041. Solomon further conceded that Denkberg appeared to be acting in good faith in seeking out the advice of counsel, and that based upon the guidance he obtained from Solomon, Denkberg "could reasonably assume that what [he was] doing was compliant with the law. . ." TR 1068.

**B.    Defense Case**

1.    <u>Andrew Lustigman</u>

After the Government had rested, defense counsel called Solomon's former employer, Andrew Lustigman. Mr. Lustigman was a 1991 graduate of American University Washington College of Law, where he managed the law review and graduated in the top 5% of his class. TR 1499. In 1995, the witness joined his father's law practice – the Lustigman Firm – specializing in trade regulation and advertising law. TR 1500. Lustigman testified that his father, Sheldon Lustigman, had been focused on direct mailing and "postal issues" since the late 1980's or early 90's. *Id.* The firm specialized in issues concerning truth in advertising and advising clients as to whether their promotions complied with applicable legal standards. TR 1503. Andrew Lustigman testified that the firm did "a lot of sweepstakes work" and that he kept abreast of industry trends to be sure he understood what was permitted under the law. TR 1542; TR 1505.

In 2011, the Lustigman firm merged with Olshan Frome Wolonsky, with Andrew Lustigman heading up the firm's advertising, marketing, and promotions group.  TR 1500.  The firm is considered one of the leading marketing practices in the country.  TR 1500.  Andrew Lustigman has published numerous articles concerning marketing and advertising law, and regularly lectures on the subject at various venues, including the Federal Bar Association.  TR 1501-1502.

Lustigman testified that he began representing Denkberg and Novis in the early 2000s.  TR 1507.  Lustigman testified that his firm was consulted to ensure that the Defendants stayed in compliance with all applicable laws and regulations.  TR 1522.  Denkberg, in particular, "often" expressed his desire to be compliant with the law.  TR 1540.

As a result, Lustigman and his firm were responsible for reviewing the Defendants' mailings for compliance purposes. TR 1508.  Lustigman testified that all of the Defendants' promotions were vetted pursuant to the "reasonable consumer standard," which asks whether an objective reasonable person would be misled by such materials.  TR 1518.  Potential promotions were marked-up by counsel, and then returned to the Defendants, who would implement the changes before sending a revised draft to counsel to be reviewed, yet again, for approval.  TR 1509-1512.

Lustigman testified that Novis and Denkberg also used the services of a competing lawyer, Charles Chernofsky (who was deceased at the time of trial).

According to Andrew Lustigman, Chernofsky was "an industry lawyer for a very long time [and] very well respected in the direct mail industry." TR 1513. At times, the Defendants would have both firms review a particular promotion for compliance. *Id*.

Complaints from customers or entities were forwarded to Lustigman's firm for review and action. TR 1525. A protocol was established to assure that complaining customers received refunds and were removed from mailing lists; higher-level complaints were handled by counsel. TR 1525-26.

In 2011 and 2012, Lustigman represented the Defendants in connection with the legal action taken by the Postal Service. TR 1519. Lustigman and his father negotiated the consent order agreement with the Postal Service. TR 1520-21. According to Lustigman's interpretation, that order did not prohibit the Defendants from continuing to send out promotions, but merely contained provisions which the Defendants needed to follow going forward. TR 1521-22. Accordingly, the law firm "tightened" its standards of review to assure that the clients were not found to have violated such order. Indeed, Lustigman testified that "Sean and Gary were adamant that they want[ed] to be in compliance with the 2012 order." TR 1523. Following 2012, the firm sought to assure that all mailings met the "expressed standards that were in the postal agreement." TR 1526-27.

Lustigman opined that all the Defendants' promotions did, in fact, meet the applicable standards – a belief which he insisted, he maintains to this day.  TR 1527-28.

2.     <u>Defendant's Attorney-Client Communications</u>

Following Mr. Lustigman's testimony, counsel for Denkberg entered into evidence Defense Exhibits (D)G2 & (D)G3 – binders containing hundreds of pages of correspondence between Mr. Denkberg and his counsel (both Lustigman and Chernofsky) regarding every promotion ever used by Horizon Marketing Services, Inc.  These communications document the painstaking review process undertaken as to each of the Defendants' mailings, with multiple iterations being circulated prior to final approval.  Such documents demonstrate that counsel approved of such mailings in each and every case, and sometimes drafted the very language which the Government claimed to be materially misleading.

The evidence further demonstrated that on multiple occasions, Denkberg asked counsel to *re-review* promotions to confirm that they were in compliance with the postal agreement and consent order.  *See* (D)X, (D)A1, (D)B1, (D)C1, (D)D1, (D)E1, (D)F1, *see also* (D)G3 Section 19B.

3.     <u>Defendant is Prevented from Introducing Emails Relating</u><br><u>To the Advice Provided to Jeffrey Novis, Shawn Phillips, Philip Priolo</u>

Finally, Defense counsel sought to demonstrate that Jeffrey Novis, Shawn Phillips, and Philip Priolo likewise were obtaining advice as to the lawfulness of

their promotions, by introducing a binder containing 241 pages of email communications between those individuals, attorneys, and the compliance department at PacNet. Such communications had been culled by defense counsel from the 65,000 "parent emails" produced pursuant to the November 2021 protective order.

The Government objected on the grounds that counsel had failed to comply with the twenty-one-day notice provision contained in the protective order. TR 1344. Counsel conceded that he had made a mistake in failing to comply with the protective order, but argued that the documents he was seeking to introduce were not privileged, and that the Government was not prejudiced. TR 1363.

Defense counsel noted that the protective order had been issued prior to the adjournment of trial, at a time when prosecutors were representing that they needed additional *weeks* to complete their privilege review. TR 1353-1353. Counsel argued that the Government had been in possession of at least some of these documents for years, providing them ample time to complete that process. TR 1357. Moreover, counsel argued that under the circumstances, it was not sufficient for prosecutors to simply dump 100,000 plus documents on counsel, without directing the Defendant's attention to the existence of *Brady* material. TR 1363; 1369. Counsel argued that the Defendants were denied access to Novis, Phillips, and Priolo when the

Government indicted them, and such documents were their only means of demonstrating good faith by such third parties. TR 1362.

Alternatively, counsel requested a continuance to the extent it was necessary to permit the Government or its taint team sufficient time to review the binder of documents; that request was denied. TR 1366.

After marking the binder as Court Exhibit 2 and making it part of the record, the court granted the Government's motion to preclude such evidence. TR 1371-1374.

## C. Summations

In summation, defense counsel argued that Defendants had acted in good faith, believing, based upon the advice of counsel, that they were operating within the parameters of the law under the "reasonable consumer" standard. TR 1667; 1677; 1724; 1735.

In rebuttal, the Government argued that the reasonable consumer standard was simply irrelevant, because it did not apply to criminal cases. As a result, the Government argued that the Defendants could be convicted if they knew that they were deceiving elderly and infirm victims – *regardless* of whether such promotions would mislead a "reasonable consumer." TR 1824.

**D.    Court's Original Charge**

Following summations, the court charged the jury.  The court's instructions included standard language concerning the jury's need to find a material misrepresentation.  In particular, the jury was charged that "a scheme to defraud is any plan to deprive someone of money or property by trick, deceit, deception or swindle that is *reasonably calculated to deceive persons of average prudence*."  TR 1875 (emphasis added).  The jury was further instructed that "a material fact is one which would reasonably expect to be of concern to a *reasonable* and prudent person" and which "a *reasonable* person might have considered important in making his or her decision."  TR 1876 (emphasis added).  In accordance with this principle, the jury was informed that mere "puffery" – an "exaggerated, blustering or boastful statement upon which no *reasonable* buyer would be justified in relying" – was insufficient to sustain a conviction.  *Id.* (emphasis added).

Additionally, the jury was charged as follows with respect to the advice of counsel:

> If the defendant you are considering relied in good faith on the advice of an attorney that his conduct was lawful, then he lacked the intent to defraud required to prove the offenses of mail and wire fraud, as well as the offenses of conspiracy to commit mail fraud and fraud using fictitious names and titles. A defendant relies in good faith on the advice of counsel if:
>
> 1. Before taking action he, in good faith, sought the advice of an attorney whom he considered competent to advise him on the matter.

2. He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct.

3. He made a full and accurate report to his attorney of all material facts that he knew; and

4. He then acted strictly in accordance with the advice of this attorney. He must in good faith honestly follow such advice, relying on it and believing it to be correct.

In determining whether the defendant acted in good faith, you may consider the reasonableness of the advice provided by the attorney.

The defendants do not have to prove their good faith reliance on counsel. Rather, the government must prove beyond a reasonable doubt that the defendant you are considering acted with the intent to defraud necessary to commit a crime.

TR 1880-1881.

**E.    The Jury's Note, the Court's Supplemental Charge, and the Verdict**

On the second day of deliberations, the jury sent two notes which went to the

very crux of the defense.  Those notes asked:

1)    Can you explain further or clarify "average prudence," and can a person be purposefully misleading but not have intent to break the law as advice of counsel said they were in the law;

2)    Page 21 the top paragraph about scheme to defraud having to be calculated to "deceive persons of average prudence."  Does it mean that it is legal to intentionally be predatory towards vulnerable people and execute the scheme to defraud people below average prudence?

TR 1924; *see also* Jury Notes at ECF 95.

25

Prosecutors, seeing an opportunity to fundamentally shape the jury's deliberations, proposed the following charge:

> The role of the average prudence instruction is to assure that the defendants' conduct was calculated to deceive, not to grant permission to take advantage of this stupid or careless . . . that is, the unreasonableness of a fraud victim in relying or not relying on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme.

TR 1928-29.

Defense counsel vehemently objected to this language. Counsel for Denkberg noted the unfairness of providing such an unusual charge *after* summation, and asked the court to instead reiterate its original instruction, which already addressed good faith and the advice of counsel. TR 1929.

Over defense counsel's objections, the court then came back with a proposed supplemental charge which closely tracked the Government's language, while further instructing the jury that a defendant could not invoke the advice-of-counsel defense if he possessed "an intent to defraud" – which the court broadly defined as an intent to deceive *any* person (even the ignorant or gullible) for the purposes of causing some financial loss.

Counsel again reiterated his objection to the proposed charge, arguing that it was unbalanced and amounted to a direction to convict. TR 1936. Counsel objected to the supplemental charge in its entirety. TR 1938. He further noted that while the

jury's note merely sought clarification of the phrase "average prudence," the court was going far beyond that – instructing the jury as to the alleged "*purpose*" of the requirement, while apparently downplaying it, and suggesting the lack of such an element was no impediment to conviction. TR 1939. Counsel argued that if anything, the court should simply inform the jury that the term was defined by its common usage and meaning. *Id*.

Counsel for Novis observed that the court's supplemental charge effectively destroyed the Defendants' reliance on the "reasonable consumer" standard, and "knock[ed] out the entire advice of counsel defense." TR 1941; *see also* TR 1946 (counsel for Denkberg arguing instruction was "basically striking reliance on counsel").

In response, prosecutors again argued that the reasonable consumer standard was *irrelevant*, and that its proposed charge would appropriately "redirect" the jury to understand this fact.

> GOVERNMENT: . . . this reasonable consumer standard is not a criminal standard. It doesn't apply. They argued throughout that the onus is on the victim not to be deceived and that is not the law here.

> COURT: Right.

> GOVERNMENT: The mail and wire fraud statute prohibits the scheme and the intent on the part of the defendant, and this instruction redirects the jury's attention appropriately in that direction, using language directly out of case law in the Circuit.

27

TR 1943.

The court agreed; as a result, it ultimately charged the jury, over Defendants'

objections, as follows:

> The second element of wire and mail fraud is that the defendant
> knowingly and willfully participated in the scheme or artifice to defraud
> with knowledge of its fraudulent nature and with specific intent to
> defraud. A scheme to defraud is any plan to deprive someone of money
> or property by trick, deceit, deception or swindle that is reasonably
> calculated to deceive persons of average prudence. Statements made
> by a defendant that would have deceived a person of ordinary prudence
> _may be_ evidence the defendant actually intended to deceive the
> recipients.
>
> Proof that a defendant created a scheme to deceive reasonable people
> _can be_ sufficient evidence that the defendant acted with an intent to
> defraud. A defendant can _also_ act with intent to defraud, if the
> defendant intended to deceive the ignorant or gullible.
>
> Your note mentioned a person who is being purposefully misleading.
> As I explained to you, the government must prove that the defendant
> acted with an intent to defraud. Intent to defraud means to act
> knowingly and with the specific intent to deceive for the purpose of
> causing some financial or property loss to another. Evidence that a
> person engaged in purposefully misleading conduct may be evidence
> that the person acted with an intent to defraud.
>
> I previously instructed you about good faith reliance on counsel. You
> must follow all of those instructions. A person who acts with an intent
> to defraud cannot also at the same time act in good faith. If the
> defendant relied in good faith on the advice of an attorney that his
> conduct was lawful, then he lacked an intent to defraud. However, a

28

<u>person who acts with an intent to defraud cannot rely on advice of counsel in good faith</u>.

TR 1950-1952 (emphasis added).

This instruction was furnished to the jury in writing. TR 1954; ECF 158. The jury subsequently returned its verdict, convicting Denkberg on thirteen of the nineteen counts in the indictment. TR 1972.

## V. <u>POST-TRIAL MOTIONS</u>

Post-trial, counsel moved for a judgment of acquittal, arguing that the jury could not have found a willful violation of the law, in light of the ample evidence supporting an advice-of-counsel defense. ECF 103.

The court denied Appellant's motion, holding that there was sufficient evidence to support the jury's verdict. Alternatively, the court ruled that "willfulness" was not actually an element of mail or wire fraud, and that it was not necessary for the Government to prove that Denkberg understood his conduct to be unlawful or illegal. ECF 128 at pp. 52-53.

## VI. <u>SENTENCE</u>

On August 2, 2023, the court sentenced Mr. Denkberg to a cumulative term of 66 months' incarceration. ECF 139.

## SUMMARY OF ARGUMENT

Gary Denkberg was consistently counseled that his promotions were lawful because they would not deceive a *reasonable* consumer. That legal advice, while framed in terms of advertising law, finds it corollary in the element of materiality, which the Government must prove in every criminal fraud case. Under the law, an advertiser who makes a non-material misrepresentation – one which would not mislead a person of average prudence – has not crossed the line into illegality. And that was precisely what Mr. Denkberg was told by multiple attorneys for more than a decade.

But here, the lower court instructed the jury – in response to a question – that Mr. Denkberg was *not entitled* to rely upon such advice as a legal defense if he understood that his promotions were misleading to *anyone* – even if only the ignorant and gullible. We respectfully submit that the lower court's supplemental instruction was wrong as a matter of law.

Such instructions deprived Mr. Denkberg of an advice of counsel defense that was not just robust, but overwhelming. Indeed, we respectfully submit that the evidence – even considered in the light most favorable to the Government – fails to demonstrate Mr. Denkberg's guilt as to any count of conviction.

Finally, we respectfully submit that the trial court erred in excluding exculpatory evidence concerning the good faith of Phillips, Priolo, and Jeffrey

Novis, or alternatively, that trial counsel was ineffective in failing to provide timely notice of his intent to use such evidence.

## ARGUMENT

**POINT I:** **THE COURT'S ERRONEOUS SUPPLEMENTAL INSTRUCTION DEPRIVED THE DEFENDANTS OF A FAIR TRIAL**

This Court has cautioned that "a trial judge must be especially careful with supplemental instructions in response to jury questions because they are often provided to the jury at crucial moments of deliberation." *United States v. Daugerdas*, 837 F.3d 212, 228 (2d Cir. 2016). Indeed, this Court has warned:

> A supplemental charge must be viewed in a special light. It will enjoy special prominence in the minds of the jurors for several reasons. First, it will have been the most recent, or among the most recent, bit of instruction they will have heard, and will thus be freshest in their minds. Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. Because supplemental instructions are generally brief and are given during a break in the jury's deliberations, they will be received by the jurors with heightened alertness rather than with the normal attentiveness which may well flag from time to time during a lengthy initial charge. And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury.

*Arroyo v. Jones*, 685 F.2d 35, 39 (2d Cir. 1982).

An incomplete or misleading supplemental charge is especially prejudicial when it undercuts the very core of a party's defense. *See United States v. Velez*, 652 F.2d 258 (2d Cir. 1981) (court's failure to re-charge jury on element of "willful membership" during supplemental charge was reversible error, where "Velez's only

31

defense was that she was not a knowing participant in the . . . scheme."); *United States v. Kopstein*, 759 F.3d 168 (2d Cir. 2014) (reversing conviction where supplemental charge likely confused jury as to "only viable defense."); *United States v. Brown*, 544 F.2d 1155 (2d Cir. 1976) (supplemental charge was "highly prejudicial to Brown's defense.").

That was precisely what happened here. The lower court's supplemental instruction severely undermined the advice-of-counsel defense. And it appeared to give the court's imprimatur to the Government's theory of the case – *i.e.*, that the Defendants could be convicted if they understood elderly and infirm clients were being deceived by their promotions – regardless of whether they believed such promotions were *lawful*, and regardless of whether the promotions were capable of deceiving persons of average prudence.

As set forth below, the lower court's supplemental instruction was legally incorrect because: (1) it incorrectly suggested that Denkberg could not avail himself of an advice-of-counsel defense to the extent that he understood his promotions contained even non-material misrepresentations; and (2) relatedly, because, it suggested to the jury, in contravention of the court's original instruction, that the Government was not actually required to prove a material misrepresentation.

**A.      The Supplemental Instruction Improperly Charged the Jury that Defendants Could Not Rely Upon Advice of Counsel If They Knew That Their Promotions Contained *Non-Material* Misrepresentations**

Where a defendant has been advised by counsel that his planned course of conduct is lawful, and where the defendant honestly accepts and relies upon such legal advice, there can be no crime – even if every other element of the offense has been made out.  "[T]he thrust of an advice of counsel defense is that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989).  This is so even if the Government believes that counsel was wrong.  As the Supreme Court has explained:

> if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do . . . and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves willful and unlawful intent; even if such advice were an inaccurate construction of the law.

*Williamson v. United States*, 207 U.S. 425, 453, 28 S. Ct. 163, 173 (1908).

Note that the crux of this defense is a good faith belief in the *legality* of one's conduct.  It does not hinge upon whether a defendant believes his actions are *misleading* – it depends on whether he believes that they are *legal*.  Hence, while it is true that a defendant must seek and follow such advice in "good faith," that expression – when used in this context – refers to an honestly held belief in the

*legality* of one's actions. *See Williamson,* 207 U.S. at 453 (explaining "no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed the advice of counsel.").

While it may sound counterintuitive to suggest that a person could act in a deceptive fashion, while simultaneously possessing a good faith belief in the lawfulness of their conduct, such scenarios abound in the context of commercial speech and marketing. Indeed, the entire premise of marketing is to present a product in the most appealing, desirable light possible. It would be easy for a cynical consumer to conclude that the intent of most marketing is to at least shade the truth in favor of the product that is being promoted. But that does not render every such promotion a criminal fraud. In both criminal law and advertising law, the concept of *materiality* is key. Hence, this Court has recently emphasized that even *objectively* untrue commercial statements will not be deemed *materially* misleading when they are "so exaggerated that no reasonable buyer could justifiably rely on them." *MacNaughton v. Young Living Essential Oils*, LC, 67 F.4th 89, 96 (2d Cir. 2023).

Given this, it is perfectly possible for a person engaged in commercial speech to understand that his marketing pitch is, at some level, misleading, but not illegal, insofar as it is the type of statement that no reasonable consumer would rely upon. And indeed, that was exactly the legal advice which the Defendants received in this

case, over and over again. Under *Williamson*, if the Defendants subjectively believed and relied upon that advice, such belief should have constituted a valid defense – regardless of whether prosecutors or the court agreed with counsel's construction of the law.

The jury's query went to *precisely* this issue, and the very heart of Denkberg's defense. It asked whether a person could "be purposefully misleading but not have intent to break the law as advice of counsel said they were in the law." For the reasons outlined above, the correct answer to this question should have been: *yes, they can*. A person can, in good faith, believe that he is acting within the law, even while understanding that his promotion is, at some level, misleading.

For instance, if a business owner believes that his advertisement is misleading, but not *materially* so, he lacks the requisite criminal intent. That is particularly true – in a case like this – where the Defendant's attorney has rendered a legal opinion to that effect. Were the rule otherwise, advertisers would be subject to criminal liability any time they were placed on notice that an advertisement or promotion had misled or deceived *any member of society* – even the most credulous or unsophisticated consumer – regardless of whether such interpretation was reasonable. That is not the law. *See United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) ("Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market.").

35

The lower court's *ad hoc*, supplemental instruction, however, conveyed precisely the opposite message. In particular, the court charged the jury that "a person who acts with an intent to defraud *cannot rely on the advice of counsel* . . ." (Emphasis added). And it broadly defined "intent to defraud" as existing whenever a defendant acts "knowingly and with the specific intent to deceive, for the purpose of causing some financial. . . loss to another." Indeed, it made it clear that such intent need not be based upon an intent to deceive the *reasonabl*e consumer, but rather, could be premised on an intent "to deceive the ignorant or gullible." TR 1951.

When combined, the logical ramification of these individual propositions is inescapable. The jury was told that the availability of the advice of counsel defense depended – not on whether the Defendant actually believed his promotions were *legal* – but whether he understood that they were *misleading* to *any* member of society. Under this instruction, the Defendants' good faith belief that they were operating within the law under the "reasonable consumer standard" was of no moment to the extent that they understood that their promotions were capable of deceiving *any* consumer – even if only the most credulous.

Put another way, the instruction denied the Defendants their ability and right to advance an advice-of-counsel defense, based upon a mere showing that their promotions contained *nonmaterial* false statements. In doing so, it prevented the

jury from considering what should have been the *central* issue at trial – whether the Defendants believed, based on the advice of their counsel, that their conduct was *lawful*.

Because the charge was both legally incorrect, and profoundly prejudicial, it mandates a new trial. *See United States v. Scully*, 877 F.3d 464 (2d Cir. 2017) (conviction vacated where court provided legally incorrect advice-of-counsel instruction); *United States v. Brown*, 544 F.2d 1155 (2d Cir. 1976) (conviction vacated where supplemental instruction undermined entrapment defense).

## B. The Supplemental Charge Was Unbalanced and Prejudicial Because It Failed to Instruct the Jury as to the Element of Materiality

Second, even apart from the court's flawed instruction concerning the availability of the advice-of-counsel defense, the supplemental charge was fatally one-sided insofar as it failed to even mention the element of materiality – a concept that was directly responsive to the jury's inquiry. To the contrary, the supplemental instruction appeared to suggest that a showing of materiality – while relevant – was not strictly required.

The first jury note asked the court to "explain further or clarify average prudence." And the second note asked whether the charged scheme had to be "calculated to deceive persons of average prudence." TR 1950.

37

Both of these questions went to the element of materiality – *i.e.*, whether the Defendants' purported misrepresentations would have the effect of deceiving a reasonable and prudent person.

But the court chose not to charge the jury on that element. Instead, it focused their attention on the "second element" of the offense – "intent to defraud." Based on this Court's decision in *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017), the court instructed the jury that such state of mind *does not* require a "scheme to deceive reasonable people." Rather, it told the jury, an intent to defraud could just as easily be based upon an intention to "deceive the ignorant or gullible."

Even if this summary of "intent to defraud" is correct when considered in isolation, as a supplemental charge, the court's instruction was woefully inadequate, because it failed to include a simultaneous reminder that, in addition to intent, the Government *still* had to prove – as a freestanding element – that the scheme employed *material misrepresentations*. *See Neder v. United States*, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841 (1999) ("materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

And that element *does* require proof of a misstatement capable of deceiving a person of average prudence. Indeed, *Weaver* itself – the very decision which the court relied upon – makes this point clear:

> In order to prove the existence of a scheme to defraud, the government *must* also prove that the misrepresentations were material . . . A

38

statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct. In other words, a lie can support a fraud conviction *only if* it is material, that is, if it would affect a reasonable person's evaluation of a proposal.

*Weaver*, 860 F.3d at 94 (internal citations omitted) (emphasis added).

The court – by focusing exclusively on the second element – conveyed to the jury that a material misrepresentation was not strictly necessary to convict the Defendants. Indeed, the supplemental instruction does not include the word "material" a single time.

The Government may argue that this omission is rendered harmless by the lower court's simultaneous instruction that the jury should also consider its original charge. But this Court has "rejected the notion that incorrect statements are necessarily cured so long as the charge contains the correct standard elsewhere. [This Court's] precedents do not stand for any such proposition. They emphasize, rather, that the instructions must be considered as a whole." *United States v. Kopstein*, 759 F.3d 168, 182 (2d Cir. 2014) (internal citations omitted). Indeed, "[a] flawed supplemental instruction can undermine and even invalidate a charge that is otherwise correct if the supplemental instruction is sufficiently incomplete and misleading." *United States v. Daugerdas*, 837 F.3d 212, 228 (2d Cir. 2016).

That was the case here. The jury was clearly struggling to understand the court's original instruction, and in particular, whether it was required to find material

39

misrepresentation capable of deceiving a person of "average prudence." That concern was more than justified, in a case where an attorney opined on the witness stand that no reasonable person would be misled by the Defendants' promotions, and where the *youngest* victim called by the Government was 93 years old.

The court's supplemental charge relieved prosecutors of the burden of proving this essential and contested element. As such, the Defendants' conviction should be vacated. *See Uzoukwu v. City of N.Y.*, 805 F.3d 409, 418 (2d Cir. 2015) (vacating verdict, where court's failure to recharge the jury on the element of willfulness in a supplemental instruction "could well have given the impression that willful membership was not an essential element, when in fact it represented the one legal requirement Velez strenuously argued the Government had not proved.").

## POINT II: THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN THE JURY'S VERDICT

The supplemental jury charge cannot be considered harmless error, because the evidence adduced in support of the Defendants' advice-of-counsel defense was strong and mostly uncontested. Indeed, we respectfully submit that a properly instructed jury would have been compelled to acquit the Defendants, and that the evidence admitted at trial was legally insufficient to support any of the charges.

While it is true that a defendant bears a heavy burden in seeking dismissal based upon legal insufficiency, and that all evidence must be viewed in the light most favorable to the Government, "[n]onetheless, a conviction based on speculation

and surmise alone cannot stand. . . [T]he government must do more than introduce evidence at least as consistent with innocence as with guilt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (internal citations omitted) (dismissing indictment based upon lack of sufficient evidence showing criminal intent).

For the reasons set forth below, we respectfully submit that the evidence in this case was legally insufficient to convict Denkberg of *either* the primary charges (Counts One through Fifteen), or the aiding and abetting counts (Counts Sixteen through Nineteen).

## A. The Evidence Was Legally Insufficient to Support the Jury's Verdict with Respect to Counts One Through Fifteen, Because the Evidence Demonstrates that Gary Denkberg Relied Upon the Advice of Counsel in Operating His Business

The evidence was legally insufficient to convict Denkberg on Counts One through Fifteen, because the Government failed to prove that Denkberg did not rely upon the advice of counsel. To the contrary – and as set forth in detail below – the evidence *overwhelmingly* demonstrated that Denkberg honestly and in good faith sought the advice of competent counsel, laid all the facts before his counsel, and honestly followed counsel's advice. *See United States v. Scully*, 877 F.3d 464, 476-77 (2d Cir. 2017) (setting forth contours of advice-of-counsel defense). Under the circumstances, no rational juror could conclude, beyond a reasonable doubt, that Mr. Denkberg *knew* that his conduct violated the law. Accordingly, because the Government failed to prove that Denkberg acted in contravention of the legal advice

41

he received, this Court should enter a judgment of acquittal with respect to Counts One, Two, Three, Four, Five, Ten, Eleven, Twelve, and Fourteen of the Indictment.[1]

1. The Defendant, in Good Faith, Sought Out
   the Advice of Competent Attorneys Before Taking Action

The undisputed evidence established that *all* promotions were reviewed and approved by competent counsel before being sent. TR 263, 279, 285-86. Indeed, the evidence demonstrated that the attorneys Denkberg sought out to do this work were not merely competent, but considered leaders within their field. TR 1499-1505; 1513. In many cases, the Defendant had two different firms review his promotions at different times to assure legal compliance. TR 1513; 1554; *see also* Defendant's Exhibits (D)G2 & (D)G3 at Sections 2, 3, 6, 7, 10, 11, 12, 13, 17, 19.

There was no evidence that Gary Denkberg acted in "bad faith" in seeking out the advice of these attorneys. As the Supreme Court has explained, a defendant acts in bad faith when he *knows* from the outset that his conduct is *illegal*: "no man can willfully and knowingly violate the law and excuse himself from the consequences there of by pleading that he followed the advice of counsel." *Williamson v. United States*, 207 U.S. 425, 453, 28 S. Ct. 163, 173 (1908).

---

[1] Mr. Denkberg was acquitted on Counts Six, Seven, Eight, Nine, Thirteen, and Fifteen. Counts Sixteen through Nineteen, which related to the aiding and abetting charges, are addressed separately in Point B.

There is simply no evidence to that effect in this case. According to Lustigman, Denkberg, in particular, "often" expressed his desire to be compliant with the law. TR 1540. And over the course of thirteen years, the Defendant, a layperson, was assured by multiple different attorneys – prominent experts in this field – that his conduct was, in fact, lawful. Indeed, even the Government's own witness, Adam Solomon, testified that Mr. Denkberg was acting in good faith and had every reason to believe, based on the advice he was given, that he was acting lawfully. TR 1068.

2. Defendant Consulted with Counsel for the Purpose of Securing Advice on the Lawfulness of His Future Conduct

Denkberg sought out counsel's advice in connection with prospective actions – not after the fact. Indeed, Lustigman testified that his firm was consulted to ensure that the Defendants stayed in compliance with all applicable laws and regulations. TR 1522.

The evidence demonstrates that Denkberg was told by multiple attorneys over the course of thirteen years that the legality of his company's mailings was dictated by the "reasonable consumer" standard. TR 1064, 1078, 1518, 1528, 1555-56; *see also* Defendant's Exhibits (D)G2 & (D)G3. Such attorneys repeatedly opined to Denkberg that, given the specific language suggested by counsel, and the extensive disclaimers contained in his promotions, no "reasonable consumer" would be deceived by such mailings.

43

At trial, of course, the Government took the position that such advice did not accurately reflect the law, and that the Defendants could be criminally liable if their mailings had the effect of confusing elderly persons suffering from cognitive impairment.  TR 824, 1824, 1943.  Indeed, prosecutors leaned heavily upon this theory in their presentation of the evidence, and the jury appears to have convicted Denkberg based upon precisely such a theory.  *See* Jury Note at ECF 95.

However, even if one assumes that the Government's interpretation of the law is legally correct, and that Denkberg's attorneys were all wrong, that is beside the point.[2]  The question, under the *Williamson* standard, is whether Denkberg relied upon such advice to guide his conduct.  And the answer to that question is clearly *yes*.

In this regard, the Court has not only the testimony of the relevant witnesses, but *extensive* documentation concerning the advice sought and obtained by Mr. Denkberg.

Defense Exhibits (D)G2 & (D)G3 consists of *hundreds* of pages of correspondence between Mr. Denkberg and his counsel regarding every promotion

---

[2]     In fact, the Government's theory of liability all but ignores the materiality requirement, which is the functional equivalent of the "reasonable consumer standard."  Under the law, "a statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a *reasonable* person to change his conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (emphasis added)

ever used by Horizon Marketing Services, Inc. They document the painstaking review process undertaken as to each of these mailings, with multiple iterations being circulated prior to final approval. These documents demonstrate that counsel did not merely approve of such mailings, but in some cases *drafted* the very language which the Government would later claim to be materially misleading.

For instance, the exhibits include correspondence between Mr. Denkberg and Charles Chernofsky concerning a 2012 iteration of the Jackpot Express promotion. On January 26, 2012, Mr. Chernofsky wrote to Mr. Denkberg, advising him that "[t]he standard used in reviewing an advertisement is that of the Reasonable Consumer Standard – how would a reasonable consumer interpret the advertisement." *See* Defense Exhibit (D)G3, Section 19A. Mr. Chernofsky then proceeded to expressly advise Mr. Denkberg that he should use the very "*win opportunity*" language which the Government has characterized as misleading. Likewise, the correspondence shows that Chernofsky *himself* proposed the language contained in the opening statement of that promotion, which read:

> Authorizing instructions for issuance of this promotion were issued on _____, 2012. At such time all internal protocols and procedures for ensuring this letter was properly addressed and issued to you were executed by internal directive, and our offices are honored to certify in writing that access information confirming Award Opportunities FUNDS OF CASH AND PRIZED totaling $1,379,000 is now pending.
>
> *Id*.

45

After Denkberg made the suggested changes to this promotion (including the above-language), a revised draft was sent to Mr. Chernofsky on January 31st. On February 7, 2012, Mr. Chernofsky wrote back to inform Denkberg that he had reviewed the promotion "for compliance with the generally accepted principles governing advertising" and that "[t]he attached revision addresses the concerns I expressed in opinion letter of January 26, 2012." *Id.*

Again, this is but one example of the advice which Mr. Denkberg received time and again, on each and every promotion, before such mailings went out. There is no question that Denkberg consulted with counsel for the purpose of securing advice as to the lawfulness of his mailings before they went out.

### 3.    Defendant Made a Full and Accurate Report to His Attorney of All Material Facts He Knew

The trial evidence also established that *nothing* was withheld from counsel. As noted above, the Defendants' employees testified that *all* mailings were furnished to counsel for approval before being sent out. TR 263, 279. Counsel was "looking at everything that [the Defendants] were mailing before they mailed it." TR 263. Complaints were also provided to counsel for review and response. TR 622; TR 1525; *see, e.g.* GX 396. Lustigman testified that such complaints were *never* ignored. TR 1526. Likewise, when Denkberg became aware of a potential investigation in late 2016, he immediately notified his attorneys, and again asked for assurance that all of his mailings were in compliance with the law. GX 268.

46

Although the Government sought to demonstrate that Denkberg hid the existence of the April 2012 postal agreement and consent order from one or more of his own attorneys, that assertion was plainly untrue. To the contrary, Denkberg expressly asked *both* the Lustigman and Chernofsky firms to review the postal agreement, in order to assure that all future mailings complied with such agreement. He was repeatedly assured by all of his attorneys that he was in compliance with such agreement.

Hence – notwithstanding the fact that the original agreement was negotiated by Andrew Lustigman and his father – Denkberg gave it to Mr. Chernofsky to review on March 22, 2012. Mr. Denkberg specifically asked Chernofsky to *again* review the Jackpot Express promotion (discussed above) and another promotion in light of the Postal Agreement. *See* DG-3, Section 19B.

After reviewing the Postal Agreement, Chernofsky *again* reiterated that the promotions were not materially misleading in light of their disclaimers and the phrase "win opportunity," and opined that such promotions "should be acceptable to the Postal Service." *Id*.

Likewise, the trial evidence unequivocally demonstrated that Denkberg repeatedly and *specifically* asked Lustigman's junior partner, Adam Solomon, to review his promotions to ensure that they were in compliance with the Postal

Agreement.  TR 883-884, 900-904, 1041-1049; *see also* Defendant's Exhibits (D)X, (D)A1, (D)B1, (D)C1, (D)D1, (D)E1, (D)F1.

To the extent that Mr. Solomon testified that he was unfamiliar with such agreement, he was either lying or profoundly derelict in his responsibilities as counsel.[3]  In either event, it is crystal clear that Gary Denkberg was not seeking to hide the Postal Agreement from Solomon or any of his other attorneys.

4.    The Defendant Acted Strictly in
Accordance with the Advice of His Attorney

Finally, the trial evidence established that Denkberg acted in strict accordance with the advice of his attorneys, and was anxious that his conduct should be within the law.  As noted above, all promotional material was provided to counsel for review.  TR 263, 279, 285-86.  Any changes suggested by counsel were provided to the copywriter and incorporated into the mailings.  TR 264.  Thereafter, the revised promotions were sent *back* to counsel for a final review, in order to ensure compliance.  TR 264, 615.  As a result, Andrew Lustigman testified as to his belief that all of the Defendants' promotions complied with the applicable law.  TR 1527-28.

---

[3]    Lustigman testified that the Postal Agreements were never concealed from Adam Solomon, and that Solomon was aware of such agreements and the circumstances surrounding them.  TR 1532-34.

On the advice of counsel, the Defendants also adopted a "no questions asked refund policy" and made sure that all clients who requested to be removed from the mailing lists, were, in fact, removed. TR 1519, 613, 627, 673. Customer complaints were never ignored. TR 1526.

Similarly, in the wake of the April 2012 Postal Agreement and Consent Order, both Mr. Denkberg and Mr. Novis "were adamant that they want[ed] to be in compliance with the 2012 order." The Defendant informed counsel that he "never want[ed] to be found to have violated a government order." TR 1522. As a result of the Postal Agreement, "the standards applicable to them were tightened" with special attention given to the provisions of the consent order. TR 1522-23. On multiple occasions, Denkberg asked counsel to *re-review* promotions to confirm that they were in compliance with the postal agreement and consent order. *See* (D)X, (D)A1, (D)B1, (D)C1, (D)D1, (D)E1, (D)F1, *see also* (D)G3 Section 19B. To that end, the Defendants even flew in their copywriter to meet with counsel in person, in order to assure that all of their future pieces were compliant with the agreement. TR 1535.

It is unclear *why* Denkberg would possibly go to such lengths if he actually understood – as the Government has suggested – that his promotions were illegal notwithstanding such changes. The answer is clear – Denkberg paid these legal fees

49

and went to great pains to follow his counsel's advice because he believed that it was keeping him within the bounds of the law.

## B. The Evidence Failed to Prove That Denkberg Aided and Abetted Phillips, Priolo, or Jeffrey Novis in the Commission of a Crime

The trial evidence likewise dictates a judgment of acquittal with respect to Counts Sixteen through Nineteen, which charged Denkberg with aiding and abetting fraudulent promotions carried out by Shawn Phillips, Jeffrey Novis, and Philip Priolo.

To establish aiding and abetting liability, the Government was obligated to prove that Denkberg knowingly and willfully participated in a scheme or artifice to defraud, with knowledge of its fraudulent nature and with the specific intent to defraud. TR 1903. The "defendant must not just in some sort associate himself with the venture, but also participate in it as in something that he wishes to bring about and seek by his action to make it succeed." *Rosemond v. United States*, 572 U.S. 65, 76, 134 S. Ct. 1240, 1248 (2014).

Taken in the light most favorable to the Government, the evidence demonstrated that: (1) Novis and Denkberg shared customer lists with Phillips, Novis, and Priolo, and (2) that Novis permitted his father, Phillips, and Priolo to utilize his company, EC Logistics, for purposes of their own mailings. TR 504-508. Notably, Denkberg did not direct the employees of EC Logistics to provide such services. TR 520-521.

Given the legal advice that Mr. Denkberg was receiving, he had no basis to believe that these third-party mailings were illegal. There is no evidence, for instance, to suggest that Denkberg understood the promotions sent out by Phillips, Novis, and Priolo to be materially different from his own.

Indeed, there is no evidence that Mr. Denkberg even *saw* the mailings that are the subject of Counts Sixteen through Nineteen.

The *only* evidence in this regard – Government Exhibits 144, 144A, 146 and 146A – show that Denkberg was emailed *pre-prints* of the NAC promotion (Count Sixteen) and the PTN promotion (Count Seventeen). Those pre-prints included *only* the underlying graphics and artwork, as well as legal disclaimers (which were identical to the legal disclaimers that Denkberg had been advised to use). The pre-prints provided to Denkberg *did not* include the actual text of the promotions utilized by Phillips, Novis, or Priolo. *See* GX 144 & 144A, GX 146 & 146A; *see also* ECF 128, p. 58 (district court denying Rule 29 motion, but acknowledging the lack of direct evidence that Denkberg saw actual promotions).

And there is no evidence that Denkberg saw *anything* relating to the specific promotions charged in Counts Eighteen and Nineteen.

Similarly, both Lilienkamp and Jacquard testified that they *never* reviewed any of these promotions, notwithstanding the assistance that they provided to

Phillips, Novis, or Priolo. TR 272; 693. Nor is there any evidence that Denkberg was privy to complaints relating to any of these mailings.

Finally, while Denkberg would not have been privy to the specific, attorney-client communications taking place between Phillips, Novis, Priolo, and their counsel, he knew – at a bare minimum – that all of their mailings were scrutinized by PacNet, which had its own legal compliance department. TR 297, 630, 1433. Indeed, PacNet's Service Agreement required all mailings be submitted to and authorized by their compliance department before going out. *See* GX 337 at pp. 4, 7, 17; *see also* GX 338.

In the absence of evidence to establish that Denkberg even *saw* the promotions in question, or was otherwise placed on notice that such mailings were violative of the law, the Government clearly failed to prove that Denkberg had "knowledge of their fraudulent nature."

## POINT III. THE LOWER COURT ERRED IN PRECLUDING DEFENSE COUNSEL FROM INTRODUCING EXCULPATORY EVIDENCE RELEVANT TO THE AIDING AND ABETTING COUNTS

It is well established that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 689-90, 106 S. Ct. 2142, 2146-47 (1986) (Internal citation omitted)). This right may be violated where a court's evidentiary rulings "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed

to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324-26, 126 S. Ct. 1727, 1731-32 (2006).

Hence, while a trial court may, in extreme circumstances, preclude exculpatory evidence based upon an attorney's failure to comply with the rules of disclosure, the Supreme Court has also noted that "alternative sanctions are adequate and appropriate in most cases. . ." *Taylor v. Illinois*, 484 U.S. 400, 413, 108 S. Ct. 646, 655 (1988).

In *Taylor*, the Supreme Court upheld the most severe remedy of preclusion based on defense counsel's failure to provide notice of his intent to call a witness. However, the facts justifying the sanction in that case were extreme. The trial attorney in *Taylor* claimed that he failed to provide timely notice because he had only learned of the witness mid-trial. In response, the lower court conducted a *voir dire* of the witness which revealed that trial counsel was lying – in actuality, counsel had interviewed the witness well prior to the start of trial. The trial court ruled that the attorney had committed a "blatant" and "willful" violation of the discovery rules, justifying the ultimate sanction of preclusion.

On appeal, the Supreme Court affirmed. It held that a defendant's Sixth Amendment right to present a defense did not create an "absolute bar" to the preclusion of surprise evidence, where a "case fits into the category of willful

misconduct in which the severest sanction is appropriate." *Taylor v. Illinois*, 484

U.S. 400, 417, 108 S. Ct. 646, 657 (1988).  As Court noted:

> It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

> A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

> *Taylor v. Illinois*, 484 U.S. 400, 414-15, 108 S. Ct. 646, 656 (1988)

Consistent with *Taylor*, this Court has held that "where prejudice to the

prosecution can be minimized with relative ease, a trial courts exclusion of

[exculpatory] testimony must be supported by a finding of some degree of

willfulness in defense counsel's violation of the applicable discovery rules." *Noble*

*v. Kelly*, 246 F.3d 93, 100 n.3 (2d Cir.), *cert. denied*, 534 U.S. 886, 122 S. Ct. 197,

151 L. Ed. 2d 139 (2001) (preclusion of alibi witness violated petitioner's Sixth

Amendment rights, where there was no finding of willfulness, and where trial court

could have used less onerous sanctions to minimize any prejudice to the prosecution).

We respectfully submit that in this case, the trial court erred in summarily excluding exculpatory evidence, without finding a *willful* failure to comply with the twenty-one day notice provision. To the contrary, the evidence before the court demonstrated exactly the opposite – *i.e.*, that defense counsel simply made a mistake in failing to timely identify the exculpatory nature of such material. Indeed, in a letter filed on May 10, 2022, defense counsel represented to the court that he "began [his] review of the voluminous documents in preparation for the defense case over the weekend [May 7th-8th]. As soon as I realized those documents would be needed, I notified the Government." *See* ECF 86 and 87; *see also* TR 1369 ("I'm a lawyer. I'm not perfect. I make mistakes.").

Counsel's failing was perhaps understandable, where the exculpatory material was buried in over 100,000 pages documents, most of which had nothing to do with the Defendants or the evidence against them, in a case where counsel was already inundated with millions of pages of discovery.

Moreover, the record does not suggest that the Government would have been unfairly prejudiced by the introduction of such evidence. Notably, the Government first sought the applicable order of protection in November of 2021 – at that time, trial was scheduled to commence in January of 2021. Prosecutors represented to the

court that the order of protection was necessary because the taint team's review would "take a number of weeks." ECF 43.

But thereafter, trial was adjourned – it did not ultimately commence until April of 2022. And yet it appears from the record that the privilege review was *never* completed – a fact which speaks to a complete lack of urgency and diligence on the part of prosecutors. Notably, defense counsel proposed a continuance to permit the Government sufficient time to complete its review of the 241-page binder – a review that would have taken no great amount of time. That request was denied. TR 1366.

The record does not suggest that the court conducted an extensive review of the documents in question; to the contrary, the record reflects that the court took approximately 15 to 20 minutes to review both the binder and the consent order. TR 1361-1362. It did not express any view on the exculpatory nature of the documents, or the extent to which they were privileged. In fact, the majority of such documents were clearly *not* privileged, insofar as they were simply communications with the compliance department at PacNet. The court did not inquire of the Government as to the status of its privilege review, whether that review was complete, or how long it would take the Government to review the documents in question. And the court made no effort to balance prejudice likely to be suffered by the respective parties.

In short, the court's decision appeared to be based on a rote and reflexive enforcement of the protective order's provisions, without any type of nuanced

consideration of the Defendant's Sixth Amendment rights, counsel's culpability, the prosecution's diligence (or lack thereof), or the supposed prejudice to the Government. We respectfully submit that the court failed to make the necessary factual findings to justify exclusion under *Taylor*.

Finally, the error was not harmless. Because the error here is of a constitution dimension – the Defendant's right to present a defense – it is the Government's burden to demonstrate that it was harmless beyond a reasonable doubt. *See Gilmore v. Henderson*, 825 F.2d 663, 665 (2d Cir. 1987) (6th Amendment violation was not harmless beyond a reasonable doubt) *citing Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).

Here, the excluded exculpatory evidence was critical in defending against the aiding and abetting charges, because it provided a critical window into the mindset of Phillips, Novis, and Priolo – witnesses who were unavailable to the Defendants because of the pending case against them. As counsel implored the court at the time:

> I want to make sure that you understand, the court understands what you are doing to the defendants' case here. We have no way of addressing the fraud because those defendants are under separate indictment. So we have no access to them. The only access we have are these emails. There is nothing they have to look at to respond to these emails. These are emails that are crystal clear as to what they are doing. There is nothing they can do about that. There is no email they can come up with. The whole thread of emails is here. There is nothing they have to search for, Judge.

> But you are cutting the heart out of the defense case.

TR 1366-1367; *see also* proposed defense exhibit ("Court Exhibit 2").

Because the lower court erred in failing to conduct the type of considered analysis dictated by *Taylor*, because its ruling interfered with the Appellant's constitutional right to present a defense, and because the Government cannot demonstrate that such error was harmless beyond a reasonable doubt, this Court should vacate the Defendant's conviction with respect to Counts Sixteen through Nineteen.

## POINT IV.  ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PROVIDE TIMELY NOTICE OF HIS INTENT TO USE THE DOCUMENTS

Alternatively, if the Court concludes that the lower court acted appropriately in excluding the admission of such evidence, it should consider whether counsel was ineffective in failing to timely comply with the twenty-one-day notice provision.

In order to establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient, defined as falling below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defense, meaning that counsel's errors were so serious that they deprived the defendant of a fair trial, creating a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d

674 (1984). Notably, even a single error by otherwise competent counsel may constitute ineffective assistance if that error "compromised the integrity of the trial as a whole." *Rosario v. Ercole*, 601 F.3d 118, 124 (2010).

Although this Court has expressed a preference for dealing with ineffective assistance claims in the context of collateral proceedings, it has nevertheless held that it may be proper to address such a claim on direct appeal where the resolution of the claim "is beyond any doubt or to do so would be in the interest of justice." *United States v. Matos,* 905 F.2d 30, 32 (2d Cir. 1990) (internal quotation marks omitted). Such appellate review is particularly appropriate "where (1) the defendant has a new counsel on appeal; and (2) argues no ground of ineffectiveness that is not fully developed in the trial record." *United States v. Costa*, 423 Fed. Appx. 5, 7, 2011 U.S. App. LEXIS 10307, 3-4 (2d Cir. 2011), *citing United States v. Williams*, 205 F.3d 23, 35 (2d Cir. 2000)."

We respectfully submit that this is one of those rare cases where the record is sufficiently developed to permit review on direct appeal. Counsel failed to comply with the twenty-one-day notice provision in the court's protective order. And by counsel's own admission, that failure was attributable to simple inadvertence – *i.e.* his failure to timely review the Government's production. Moreover, because the excluded emails were marked as a court exhibit, this Court has access to such materials to review. As noted above, those materials are clearly exculpatory, and in

their absence, the Defendant was not able to introduce *any* evidence concerning the good faith of Messrs. Phillips, Jeffrey Novis, and Priolo.

In short, counsel's failure to file the required notice deprived the Defendant of his ability to produce crucial exculpatory evidence relevant to the jury's consideration of the aiding and abetting counts. Given the general paucity of evidence tying Denkberg to such conduct to begin with, there is at least a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *See Harrison v. Cunningham*, 512 F. App'x 40, 42 (2d Cir. 2013) (attorney's failure to file notice of alibi, resulting in exclusion of exculpatory testimony, was ineffective assistance of counsel); *Clinkscale v. Carter,* 375 F.3d 430 (6th Cir. 2004) (same); *Stewart v. Wolfenbarger,* 468 F.3d 338 (6th Cir. 2006) (same); *Sussman v. Jenkins,* 636 F.3d 329 (7th Cir. 2011) (failure to provide notice of intent to introduce prior false allegation of sexual abuse amounted to ineffective assistance of counsel).

**POINT V. APPELLANT JOINS IN THE ARGUMENTS OF
CO-DEFENDANT SEAN NOVIS TO THE EXTENT APPLICABLE**

Finally, Mr. Denkberg respectfully joins in the appellate arguments advanced by his co-defendant, Sean Novis, to the extent that they are applicable.

## **CONCLUSION**

For the reasons set forth above, the Appellant's conviction should be set aside.

Dated:      Garden City, New York
              February 12, 2024

                            Respectfully submitted,

                 By:   /s/ Matthew W. Brissenden
                            Matthew W. Brissenden, P.C.
                            *Counsel for Gary Denkberg*
                            666 Old Country Road, Suite 501
                            Garden City, NY 11530
                            516-683-8500

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to Defendant-Appellant, I hereby certify that this brief complies with the type - volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 13,681 words appear in the brief.

By:    <u>/s/ Matthew W. Brissenden</u>
Matthew W. Brissenden, P.C.
*Counsel for Gary Denkberg*
666 Old Country Road, Suite 501
Garden City, NY 11530
516-683-8500