# 23-6877(L), 23-6925(CON)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————————

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

GARY DENKBERG, SEAN NOVIS,
Defendants–Appellants.

————————————

On Appeal from the United States District Court
for the Eastern District of New York, No. 2:20-cr-00335

————————————

## BRIEF FOR APPELLEE UNITED STATES

————————————

AMANDA N. LISKAMM
Director

JOSEPH M. WILLIAMS
Assistant Director

CHARLES B. DUNN
CAROLYN F. RICE
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

AMANDA L. MUNDELL
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 305-4491
Amanda.Mundell@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ v

STATEMENT OF JURISDICTION ........................................... 1

STATEMENT OF THE ISSUES .............................................. 1

STATEMENT OF THE CASE ................................................... 2

    I.     Procedural History ............................................................... 2

    II.    Statement of Facts .............................................................. 3

            A.    Novis And Denkberg Begin Mailing Deceptive Prize Notices. ................................................................ 4

            B.    Customers Complain, And The U.S. Postal Service Orders Defendants To Cease And Desist. ..................... 9

            C.    Novis And Denkberg Aid And Abet Others Who Operate Similar Mail Fraud Schemes. ......................... 12

            D.    Defendants Are Tried And Convicted Of Crimes Stemming From Their Scheme And the Schemes They Aided And Abetted. ........................................... 15

    III.    Rulings Under Review and Standards of Review ............... 17

SUMMARY OF ARGUMENT .................................................. 17

ARGUMENT ............................................................................. 21

    I.     Sufficient Evidence Supports Defendants' Convictions For Conspiracy, Mail Fraud, Wire Fraud, And Using Fictitious Names. ............................................................. 21

            A.    Background .................................................................. 21

i

B.     Standard of Review. ....................................................23

C.     A Rational Juror Could Find That Defendants' Misrepresentations Were Material. ...........................24

D.     A Rational Juror Could Find That Novis And Denkberg Acted With The Intent To Defraud. ............29

E.     A Rational Juror Could Have Rejected Defendants' Advice-Of-Counsel Defense. ..........................................34

II.    Sufficient Evidence Supports Defendants' Convictions For Aiding And Abetting Mail Fraud. ...................................39

A.     Background ...............................................................39

B.     Standard Of Review. ................................................41

C.     A Rational Juror Could Find That Defendants Aided And Abetted Mail Fraud. ................................41

III.   The District Court's Supplemental Jury Instructions Were Free From Error. ........................................................46

A.     Background. ..............................................................47

B.     Standard Of Review. ................................................51

C.     The District Court Committed No Reversible Error With Its Supplemental Instructions. ...........................52

       1.    The district court properly instructed the jury on good faith. .....................................................53

       2.    The district court did not plainly err by not repeating its instruction on materiality. ............57

       3.    Any error was not prejudicial. ...........................62

IV. The District Court Did Not Abuse Its Discretion In Admitting Out-Of-Court Statements Regarding Victims' Beliefs About Defendants' Fraudulent Prize Notices...........62

    A. Background. .................................................................62

    B. Standard Of Review. ...................................................64

    C. The District Court Properly Admitted Victims' Beliefs About Defendants' Prize Notices. ...................64

    D. In The Alternative, Any Error Was Harmless. ...........70

V. The District Court's Admission Of Certain Correspondence To And From State Attorneys General Did Not Violate, Plainly Or Otherwise, The Confrontation Clause. ...........................................................71

    A. Factual Background. ....................................................72

    B. Standard of Review. ....................................................75

    C. The District Court Properly Admitted This Evidence To Show Notice. .............................................76

VI. The District Court Did Not Abuse Its Discretion In Excluding Evidence That Was Subject To An Ongoing Protective Order. ....................................................................79

    A. Background .................................................................79

    B. Standard Of Review ....................................................83

    C. The District Court Did Not Abuse Its Substantial Discretion When Precluding The Introduction Of Certain Documents Because Of Counsel's Failure To Follow A Court-Ordered Notice Requirement........83

iii

VII. The Court Should Decline To Reach Denkberg's Ineffective Assistance Of Counsel Claim, Which Is, In Any Event, Without Merit. .................................................88

    A. Standard of Review. .................................................89

    B. The Court Should Decline To Address Denkberg's Ineffective Assistance Of Counsel Claim On Direct Appeal.........................................................89

    C. If The Court Does Reach The Claim, It Should Deny It.........................................................90

CONCLUSION ...........................................................94

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................ 80

*Crawford v. Washington,*
    541 U.S. 36 (2004) ................................................................ 76

*Jackson v. Virginia,*
    443 U.S. 307 (1979) .............................................................. 24

*Linden v. United States,*
    254 F.2d 560 (4th Cir. 1958) ............................................... 35

*MacNaughton v. Young Living Essential Oils, LC,*
    67 F.4th 89 (2d Cir. 2023) ................................................... 60

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.,*
    673 F.3d 84 (2d Cir. 2012) .................................................. 71

*Noble v. Kelly,*
    246 F.3d 93 (2d Cir. 2001) ........................................... 83, 86

*Pennsylvania v. Ritchie,*
    480 U.S. 39 (1987) ................................................................ 84

*Rosales-Mireles v. United States,*
    585 U.S. 129 (2018) .............................................................. 52

*Shepard v. United States,*
    290 U.S. 96 (1933) ................................................................ 69

*Simmons v. Dalsheim,*
    543 F. Supp. 729 (S.D.N.Y. 1982), *aff'd*, 702 F.2d 423 (2d Cir. 1983) .................................................................................. 55

*Strickland v. Washington,*
  466 U.S. 668 (1984)...................................................................90

*Taylor v. Illinois,*
  484 U.S. 400 (1988)..................................................... 84, 85, 87

*Thyroff v. Nationwide Mut. Ins. Co.,*
  460 F.3d 400 (2d Cir. 2006) ...........................................65

*United States v. Best,*
  219 F.3d 192 (2d Cir. 2000) .......................................41, 90

*United States v. Cardascia,*
  951 F.2d 474 (2d Cir. 1991) ......................................67, 68

*United States v. Cedeno,*
  756 F. App'x 24 (2d Cir. 2018) .........................................64

*United States v. Cedeño,*
  756 F. App'x 24 (2d Cir. 2018) .........................................75

*United States v. Corsey,*
  723 F.3d 366 (2d Cir. 2013) .............................................58

*United States v. Daugerdas,*
  837 F.3d 212 (2d Cir. 2016) .............................................61

*United States v. Detrich,*
  865 F.2d 17 (2d Cir. 1988) ...............................................65

*United States v. Dupree,*
  706 F.3d 131 (2d Cir. 2013) .............................................77

*United States v. Ferguson,*
  676 F.3d 260 (2d Cir. 2011) .............................................64

*United States v. Gershman,*
  31 F.4th 80 (2d Cir. 2022)...........................................51, 52

vi

*United States v. Gomez,*
617 F.3d 88 (2d Cir. 2010) ................................................................ 70

*United States v. Greenspan,*
923 F.3d 138 (3d Cir. 2019) .............................................................. 55

*United States v. Guadagna,*
183 F.3d 122 (2d Cir. 1999) .............................................................. 29

*United States v. Harris,*
733 F.2d 994 (2d Cir. 1984) .............................................................. 67

*United States v. Kaid,*
502 F.3d 43 (2d Cir. 2007) ................................................................ 89

*United States v. Lawal,*
736 F.2d 5 (2d Cir. 1984) ........................................................... 69, 70

*United States v. Litvak,*
889 F.3d 56 (2d Cir. 2018) ................................................................ 59

*United States v. Matos,*
905 F.2d 30 (2d Cir. 1990) ................................................................ 89

*United States v. Mazer,*
631 F. App'x 57 (2d Cir. 2015) ......................................................... 66

*United States v. Miller,*
954 F.3d 551 (2d Cir. 2020) .............................................................. 51

*United States v. Moseley,*
980 F.3d 9 (2d Cir. 2020) .......................................... 32, 33, 64, 77

*United States v. Nobles,*
422 U.S. 225 (1975) .................................................................... 84, 85

*United States v. Oladimeji,*
463 F.3d 152 (2d Cir. 2006) .............................................................. 89

vii

*United States v. Pierce,*
  785 F.3d 832 (2d Cir. 2015) ............................................................ 24

*United States v. Pipola,*
  83 F.3d 556 (2d Cir. 1996) .............................................................. 41

*United States v. Press,*
  336 F.2d 1003 (2d Cir. 1964) .................................................. 33, 36, 77

*United States v. Regent Office Supply Co.,*
  421 F.2d 1174 (2d Cir. 1970) ........................................ 26, 27, 28, 31

*United States v. Scully,*
  877 F.3d 464 (2d Cir. 2017) ...................................... 34, 35, 53, 56, 57

*United States v. Shellef,*
  507 F.3d 82 (2d Cir. 2007) .............................................................. 34

*United States v. Smith,*
  198 F.3d 377 (2d Cir. 1999) ............................................................ 41

*United States v. Southland Corp.,*
  760 F.2d 1366 (2d Cir. 1985) .......................................................... 65

*United States v. Starr,*
  816 F.2d 94 (2d Cir. 1987) .............................................................. 34

*United States v. Sutton,*
  337 F.3d 792 (7th Cir. 2003) ........................................................... 75

*United States v. Svete,*
  556 F.3d 1157 (11th Cir. 2009) (en banc) ......................................... 25

*United States v. Thomas,*
  377 F.3d 232 (2d Cir. 2004) ...................................................... 24, 59

*United States v. Valencia,*
  645 F.2d 1158 (2d Cir. 1980) .......................................................... 59

*United States v. Velez,*
  652 F.2d 258 (2d Cir. 1981) .......................................................... 52, 61

*United States v. Weaver,*
  860 F.3d 90 (2d Cir. 2017) .................................... 24, 32, 58, 60

*United States v. Wiley,*
  846 F.2d 150 (2d Cir. 1988) ............................................................. 41

*United States v. Williams,*
  205 F.3d 23 (2d Cir. 2000) .............................................................. 89

*Uzoukwu v. City of N.Y.,*
  805 F.3d 409 (2d Cir. 2015) ............................................................ 61

*Wagner v. County of Maricopa,*
  747 F.3d 1048 (9th Cir. 2013) .......................................................... 66

## Statutes and Rules

U.S. Const. amend. VI ...................................................................... 76

18 U.S.C. § 2 ................................................................................ 2, 41

18 U.S.C. § 1341 ...................................................................... 2, 21, 28

18 U.S.C. § 1342 .......................................................................... 2, 21

18 U.S.C. § 1343 .......................................................................... 2, 21

18 U.S.C. § 1349 .......................................................................... 2, 21

18 U.S.C. § 3231 .............................................................................. 1

28 U.S.C. § 1291 .............................................................................. 1

Fed. R. Crim. P. 16 ......................................................................... 80

Fed. R. Evid. 403 ............................................................................ 71

Fed. R. Evid. 801 ............................................................................ 64

ix

Fed. R. Evid. 803 ..................................................... 66, 68, 69, 73

**Other Authorities**

1 Leonard B. Sand, et al., *Modern Federal Jury Instructions: Criminal*, Instruction 8-4 (2017) ........................................56

## STATEMENT OF JURISDICTION

Defendants-Appellants Gary Denkberg and Sean Novis appeal from judgments of conviction in a criminal case. The district court (Azrak, J.) had jurisdiction under 18 U.S.C. § 3231. Novis's and Denkberg's judgments were entered on August 3, 2023. Dkts.137, 139. Denkberg and Novis filed timely notices of appeal on August 7 and August 14, 2023, respectively. Dkt.141, 143. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether sufficient evidence supports defendants' convictions for conspiracy to commit mail fraud, mail fraud, wire fraud, and the use of fictitious names in furtherance of a scheme to defraud.

2. Whether sufficient evidence supports defendants' convictions for aiding and abetting mail fraud.

3. Whether the district court reversibly erred when issuing a supplemental jury instruction.

4. Whether the district court abused its discretion when admitting testimony regarding victims' beliefs about defendants' fraudulent prize notices.

1

5. Whether the district court's admission of letters to and from state attorneys general regarding consumer complaints plainly violated the Confrontation Clause.

6. Whether the district court abused its discretion excluding certain documents that are subject to an ongoing protective order on the ground that defense counsel failed to comply with a court-ordered notice requirement.

7. Whether defense counsel was constitutionally ineffective when failing to comply with the court-ordered notice requirement.

## STATEMENT OF THE CASE

### I. Procedural History

A federal grand jury sitting in the Eastern District of New York returned a 19-count superseding indictment charging Novis and Denkberg with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); six counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 2-7); four counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 8-11); four counts of use of fictitious names and titles in violation of 18 U.S.C. § 1342 (Counts 12-15); and four counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 and 1341 (Counts 16-19). Dkt.33.

Following a three-week trial, a jury found Novis guilty on all 19 counts. Dkt.96. The jury acquitted Denkberg on two counts of mail fraud (Counts 6 and 7), two counts of wire fraud (Counts 8 and 9), and two counts of fraud using fictitious names (Counts 13 and 15), and found him guilty on the remaining counts. *Id.*

The district court sentenced Novis to 90 months of imprisonment, to be followed by two years of supervised release. Dkt.137, at 3-4. The court further ordered Novis to pay a $500,000 fine and $60,503,668 in forfeiture. *Id.* at 7; Dkt.137-1, at 1. The court sentenced Denkberg to 66 months of imprisonment, to be followed by two years of supervised release. Dkt.139, at 3-4. The court further ordered Denkberg to pay a $250,000 fine and $19,020,522 in forfeiture. *Id.* at 7; Dkt.139-1, at 1.

The district court denied Novis's and Denkberg's requests for bail pending appeal, Dkt.159, as did this Court, *see* Order, No. 23-6877 (Nov. 14, 2023).

## II. Statement of Facts

From 2003 to 2016, Novis and Denkberg engaged in a mass-mailing fraud scheme that sent fake prize notices to hundreds of thousands of American consumers. For part of that period, they also aided and abetted

3

others running similar schemes. All told, the defendants' scheme, and their efforts to aid others, cost their victims more than $92 million. The government proved the following facts at trial.

### A. Novis And Denkberg Begin Mailing Deceptive Prize Notices.

In 2003, Novis owned and operated a direct-mailing business in Long Island, New York. Tr.500, 502, 851. Denkberg came aboard in 2004, *see* Tr.628-29, 1554, and from then on, the two worked together to disseminate fraudulent prize notices.

Defendants sent numerous variations of these notices, *see, e.g.*, Ex.109, 119, 121, 125, 126, 127, 129-37,[1] but the basic set-up was the same: the notices used a combination of eye-catching graphics and enticing language to give "the impression that [the recipients] had already won" a large cash prize—typically more than $1 million—and needed only to pay a small fee to claim the prize. Tr.227, 775. However, victims who paid the fee did not receive the advertised cash prizes. *E.g.*, Tr.82, 554-55. Instead, those who fell prey to the scheme and paid the fee received a "sweeps report"—a thin booklet with publicly available

---

[1] Denkberg was acquitted on counts pertaining to Ex.121, 125, 126 and 137.

information that described sweepstakes the recipient could enter. Tr.143, 147-48, 381; *see also* Ex.159 (booklet). Novis and Denkberg never awarded a prize to anyone.

Defendants went to great lengths to make their mailings appear official and legitimate. They designed the notices so that they appeared to be sent by important officials at companies with prestigious names that suggested they were connected to prizes, like "The International Data Reporting Center," "Jackpot Express," and "Nation Report Center." *E.g.*, Ex.119, 127, 129. Defendants also hired an artist to design rubber stamps, official-looking seals, and hand-drawn signatures—features that would "lend credibility" and "make it look like somebody had actually individually handled [the] document." Tr.745-46, 772, 781-82, 788. Some of their mailings were even created to look like certificates or a cashier's check. Tr.782.

Defendants' mailings also created the impression that each recipient had been personally selected out of thousands of other people. Defendants personally addressed the notices to each recipient, often employing friendly introductory language like, "Dear Marilyn, [i]t is my absolute honor to send you this notification today," Ex.129, at 2, or "Dear

5

Janet . . . Our offices extend our most Best Wishes to you," Ex.119, at 2. To reinforce the impression that the recipient had "been singled out," Tr.785, defendants assigned recipients official-seeming "matter" and identification numbers, *e.g.*, Ex.129, at 2; Ex.480, and wrote that the notices were "Non-Transferable," *e.g.*, Ex.119, at 4. They described the recipient as a "confirmed entrant identified as eligible receiver," "selected winner," or "identified individual." Ex.129, at 4; Tr.785. Far from personally selecting these individuals, Novis and Denkberg obtained their names by buying them from "list brokers"—companies that "research[] names and addresses and suppl[y] them" for a fee. Tr.140.

To make the notices enticing, defendants used large, bold, capitalized font that emphasized the cash prize that the recipients had apparently won. *See, e.g.*, Ex. 129, at 2, 4 (using big, bold font for "$1,212,000.00" and "AVAILABLE and GUARANTEED to you" and describing the recipient as a "SELECTED WINNER—PAY GUARANTEED"). And to make it more likely that customers would pay the requested fee, they used language that injected a sense of urgency. Recipients were advised to respond right away, as the matter demanded

6

"IMMEDIATE ATTENTION" and had to be "REVIEW[ED] AT ONCE." *E.g.*, Ex.121, 132.

This large, emphasized text dwarfed other language about what defendants were actually planning to send to victims: "prize opportunities"—i.e., sweepstakes entry information. *E.g.*, Ex.129, at 4. Defendants were well aware of the need to craft their notices this way, because language that stated too clearly or too often that the recipient had not "won any money" and that the mailing is "not an awards notification" would not perform well. Ex. 361. So, to further confuse victims and obscure the true nature of their operation, defendants used convoluted descriptors like "Actual Prize Entry Directives Report" and "Entrant Procedure and Compliance directives" to describe the sweepstakes report booklets. Ex.119, at 2; Ex.130, at 2; Ex.131, at 2. Their artist chose this language specifically because it was "confusing" and because the phrase "sweepstakes rules . . . sounds too true." Tr.780. Defendants relegated so-called disclaimers to the backs of the notices in blocks of greyed out text, *see, e.g.*, Ex.131, at 3, or else near the bottom of the front of the notices and in "small type" so that they were "difficult to read," "appear[ed] boring," and "ha[d] no real meaning." Tr.779, 788-90.

7

Once defendants received the requested fees, they "flagged" the responding victims, separated the cash from the checks that they received, and sent the checks to Pacific Network Services ("PacNet")—a Canadian payment processor—which, in turn, deposited the checks and wired the proceeds to the defendants' business bank accounts in the United States. Tr.138, 499, 601, 1016, 1096; Ex.337 (agreement with PacNet). Defendants then bombarded the flagged customers with similar prize notices purporting to be from other companies, with many victims receiving a notice nearly every other day for the next 30 days. *See* Tr.137-38, 1154-69, Ex.152A, at 141-42.

Defendants shared their mailings with attorneys who provided input on "compliance with the generally accepted principles governing advertising." Tr.1064; Dkt.103-3, at 39. These attorneys advised that their mailings would be reviewed under a "reasonable consumer standard," which applies in challenges under advertising laws. Dkt.103-3, at 39. But their advice frequently contained disclaimers that the attorneys could not provide a "warranty of outcome of any litigation or administrative proceeding" and that "there can be no assurance that the Postal Service or other regulator might not view the matter differently."

8

*E.g.*, *id.* What minimal edits their attorneys did make were often incorporated before putting the revised notices in the mail, though not always. *Compare, e.g.*, Dkt.103-3, at 140, *with, e.g.*, Ex. Ex.130 at 2, 4; Ex. 135.

### B. Customers Complain, And The U.S. Postal Service Orders Defendants To Cease And Desist.

1. Predictably, defendants' fake-prize scheme gave rise to countless consumer complaints to defendants and the authorities, as well as numerous victim inquiries about why they had not yet received the promised prize money. *See, e.g.*, Tr.935-36, 1102-29, Ex.170, 353, 379. Much of this correspondence revealed that those who were duped were frequently elderly or infirm. *E.g.*, Tr.587; Ex.381, at 24-25.

In response to these complaints and other correspondence, defendants would often send customers a disclaimer letter, advising them that they were not winning the sweepstakes but instead "buying booklets to enter into sweepstakes." Tr.605-06; *see also* Ex.487, at 7 (letter to customer stating "[i]t appears that you had misunderstood the sales promotion that we had sent to you"). If the customer requested a refund of the fees that were paid, defendants obliged. Tr.604.

The volume of repeat payments received from elderly customers in particular caught PacNet's attention, which advised defendants in 2008 that they faced "a significant regulatory risk" and should "do a better job of removing these multi buyers, who are nearly always elderly, from [defendants'] mailing list." Ex.352, at 2. Defendants did remove complaining customers from their mailing lists. *See, e.g.*, Tr.682-90. They did not, however, alter their mailings to avoid further confusion or deception, and they continued to allow "elderly" "multi buyers" through the end of the scheme in 2016. *See, e.g.,* Ex.655.

2. In 2012, the U.S. Postal Service brought two administrative actions against defendants to stop their fraudulent prize notice scheme. Ex.14, 15. These actions culminated in cease-and-desist agreements, which defendants signed. Ex.14, at 17; Ex.15, at 16. Among other things, defendants agreed to "cease and desist immediately from falsely representing, directly or indirectly, expressly or impliedly, in substance and effect, whether by affirmative statements, implications or omissions that . . . recipients of [defendants'] solicitations have won a prize consisting of a large amount of money" and that "the solicitation is something other than an offer to sell information." Ex.14, at 4; Ex.15, at

10

4; Tr.395-97. They further agreed to "permanently discontinue[] and abandon[] and [never] resume[], directly or indirectly, under any name or names or through any corporate or other device" their mailing scheme. Tr.386; Ex.14, at 12; Ex.15, at 12.

Defendants resumed their activities almost immediately, forming new shell companies to operate their fake-prize scheme and mailing nearly identical versions of the prize notices that they had been sending victims for years. To the extent they made any substantive changes, those changes were minor in nature, often adding the word "opportunity" in smaller or lowercase font next to the bigger offer of money or prizes. For example, in one mailing that pre-dated the cease-and-desist agreements, defendants sent consumers notices that offered "MONEY/PRIZES" worth $1,900,000. *See* Ex.671, at 4 (2004 notice). Following the cease-and-desist agreements, Novis's updated version of this same mailing offered customers the "CASH/PRIZE opportunity" of $1,900,000, and otherwise kept the substance of the pitch the same. *See* Ex.121, at 1.

Defendants' fraudulent scheme ended in September 2016, when the government obtained an injunction in a civil anti-fraud action against the

11

defendants and their business entities under 18 U.S.C. § 1345. *See* Tr.1279; Dkt.35, *United States v. Novis*, No. 16-cv-5263 (E.D.N.Y. Feb. 23, 2017).

### C. Novis And Denkberg Aid And Abet Others Who Operate Similar Mail Fraud Schemes.

In addition to running their own scheme, Novis and Denkberg also helped three other individuals run similar prize notice schemes from 2015 to 2016. *E.g.*, Tr.523-28. Two of these individuals—Jeffrey Novis and Shawn Phillips—were familiar to defendants. Jeffrey Novis is Sean Novis's father, Tr.521, and Phillips worked for Novis and Denkberg as a copywriter, drafting the substance of their prize notices, Tr.630. The third individual was a man named Phillip Priolo. Tr.520.

Like Novis and Denkberg, these individuals created prize notices and mailed sweepstakes reports to customers who paid the requested fees. *See* Tr.520. Phillips, Priolo, and Jeffrey Novis shared drafts of some of these prize notices with Denkberg. *See* Ex.144, 144A, 146, 146A. Those drafts revealed that the design and substance of the prize notices were similar to the notices that defendants created. *See id.* For example, the drafts used the same deceptive strategies that defendants had employed for years, including fake seals, language creating a false sense

of urgency, fake company officer signatures verifying the document, and other confusing language. One notice described itself as a "Pending Awards Notification" and a "Rush Notice" for a "Filed Matter." Ex.144A, at 4. Another stated that the recipient "Is The Guaranteed Receiver Of The Available Cash & Awards Opportunity As Reported On Ledger Of Entrant Directives On File For Prompt Release In The Full And Total Amount Stated," and claimed it is "100 Percent Guaranteed! Extremely Time-Sensitive" next to a $1.2 million figure "exactly." Ex.146A, at 2.

Novis and Denkberg helped Phillips, Priolo, and Jeffrey Novis carry out their operations by advising on mailing schedules, *see* Ex.370, 370A, and sharing customer mailing lists, Tr.649-50, 692-93, which allowed the groups to widen their customer base and target more individuals. The two groups also shared employees. For example, Novis and Denkberg's employees performed customer data analysis, inventory monitoring, mail scheduling, and sweepstakes research for Phillips, Priolo, and Jeffrey Novis. Tr.115-16, 520-21, 527-31, 692; *see also* Ex.188A, 188B, 192, 194, 195, 195A (services agreement and invoices). They also opened and sorted customer responses to the mailings that Phillips, Priolo, and Jeffrey Novis sent out. Tr.531. Although Novis explicitly directed the

employees to perform these tasks for these individuals, Tr.525-26, Denkberg, who shared an office with Novis, had joint control over these employees. *See, e.g.*, Tr.106-07, 119, 646. Novis and Denkberg also provided advice regarding Phillips's, Priolo's, and Jeffrey Novis's mailing schedules. Ex.360 (referencing the "very valuable advice" Novis gave Phillips "over the years"); Ex.370 (suggesting changes to mailing schedule).

Novis was aware that some of Phillips, Priolo, and Jeffrey Novis's mailings triggered consumer complaints and caught the attention of the Minnesota Attorney General's Office. *See* Ex.410. In 2015, he and Denkberg sought attorney advice regarding the relationship between themselves and Phillips, Priolo, and Jeffrey Novis. *See* Ex.268. Out of "concern" that Phillips, Priolo, and Jeffrey Novis's activities might "implicate" defendants, defendants' attorney advised Novis and Denkberg to move the "caging" activities[2] to a different location to avoid caging Phillips's, Priolo's, and Jeffrey Novis's mail in the same location where defendants worked. Tr.1577-79.

---

[2] Caging is the process of removing payments and recording transactions. Tr.113-14.

14

In addition to sharing employees and mailing lists, Novis and Phillips shared confidences. In November 2011, Novis sent Phillips an email expressing frustration that Phillips was "not taking [his] calls." Ex.360. Novis stated that he had not "mentioned anything that [they] talk about to anyone," and that he had "told [Phillips] things that nobody outside of [Novis's] office knows, like the 14 letters we got from the postal inspectors and even things [Novis's] partners don't know." *Id.* Novis stated that there was "nobody that [he has] spoken to about [his] business as openly as [he] talk[ed] to [Phillips]." *Id.*

### D. Defendants Are Tried And Convicted Of Crimes Stemming From Their Scheme And the Schemes They Aided And Abetted.

Defendants' trial lasted three weeks. The government called 16 witnesses and offered hundreds of documentary exhibits proving the evidence summarized above.

For their part, Novis and Denkberg primarily argued that they lacked the requisite intent to defraud because they relied in good faith on the advice they received from their attorneys. In support, they called one witness—one of their advertising attorneys, Andrew Lustigman—and

15

offered exhibits largely containing correspondence between defendants and their attorneys. *See, e.g.*, Dkts.103-3, 103-4, 103-5.

Lustigman testified that he advised defendants that their mailings were lawful because they would not deceive a reasonable consumer. *See* Tr.1518-23, 1527-28. But he admitted that his advice was only as good as the information provided to him. Tr.1557-59. He also admitted that it would be improper to use false names to deliberately confuse people and to use post office boxes to conceal who is sending fraudulent mail. *Id.*

Lustigman also testified to the advice he gave to defendants regarding their relationship with Phillips, Priolo, and Jeffrey Novis. *See* Tr.1577-78 (advising defendants to move caging). Notwithstanding his concerns, he did not indicate that he ever advised defendants to disassociate from Phillips, Priolo, and Jeffrey Novis. *See id.*

The jury found Novis guilty of all offenses charged in the superseding indictment. Dkt.96. The jury acquitted Denkberg on two counts of mail fraud (Counts 6 and 7), two counts of wire fraud (Counts 8

16

and 9), and two counts of fraud using fictitious names (Counts 13 and 15), but found him guilty on the remaining counts.[3] *Id.*

## III.  Rulings Under Review and Standards of Review

The rulings under review and the applicable standards of review are set forth in the relevant argument sections below.

## SUMMARY OF ARGUMENT

I.  Sufficient evidence supported defendants' convictions for conspiracy, mail fraud, wire fraud, and using fictitious names based on insufficient evidence.  Among other things, a rational juror could find from the design and substance of the mailings that defendants intentionally and materially tricked consumers into paying defendants with the understanding that they were claiming the prize set forth in the notices.  That defendants sought the advice of counsel regarding the legality of their mailings does not defeat their fraudulent intent.  The evidence presented at trial demonstrated that defendants did not seek

---

[3] Each of the counts on which Denkberg was acquitted charged specific instances of fraud carried out by Novis, but not necessarily by Denkberg.  For instance, Counts 6 and 7 pertained to cash payment sent from certain victims to a mailbox owned and controlled by Novis.  *See* Dkt.33, at 7; Tr.1487; Ex.125, 126.  Counts 8 and 9 pertained to wire transfers authorized by Novis.  *See* Ex.651, 652.  And Counts 13 and 15 related to two mailings created at Novis's direction.  *See* Ex.121, 137.

this advice in good faith—often failing to provide their attorneys with all relevant information—and, in many instances, did not follow their attorneys' advice.  At a minimum, a rational jury was certainly entitled to reject defendants' claims to the contrary.

II.    Ample evidence also supported the jury's verdict on the aiding and abetting counts.  A rational juror could infer that defendants knew Phillips, Priolo, and Jeffrey Novis were running fake-prize schemes that were similar to the one defendants were running.  Among other things, Denkberg saw some of these individuals' draft prize mailings, and Novis knew that they had received complaints.  A rational juror also could find that defendants helped these individuals by sharing employees, sharing customer lists, and providing Phillips, Priolo, and Jeffrey Novis with advice so that the schemes could continue.

III.    The district court's supplemental jury instruction, given in response to juror questions, was not erroneous.  The court's instruction tracked the language of this Court's decisions regarding intent, good faith, and reliance on the advice of counsel.  Although Denkberg now contends that the supplemental instruction should have addressed the element of materiality, he failed to raise that objection below.  And, in

18

any event, no such instruction was necessary, as the court's supplemental instruction were neither incomplete nor misleading regarding the charges.

IV. The district court did not err in admitting testimony from relatives regarding victims' beliefs about defendants' fake prize notices. That testimony was admissible under Federal Rule of Evidence 803(3) as statements of the victims' then-existing beliefs. It was also admissible for the non-hearsay purpose of demonstrating the victims' state of mind.

V. The district court also committed no plain error in admitting letters written to defendants from state attorneys general regarding numerous consumer complaints. Defendants' contention that the admission of this correspondence violated the Confrontation Clause is without merit: the letters were admitted for the non-truth purpose of showing that defendants were on notice regarding the misleading nature of their fake prize mailings.

VI. The district court also did not abuse its sizeable discretion when excluding emails between Phillips, Priolo, Jeffrey Novis, PacNet, and their attorneys regarding the legality of their mailings. Because these emails were subject to an ongoing protective order, the court had

required the defendants to provide 21 days pretrial notice if they wished to use them at trial. In violation of that court-ordered notice requirement, the defendants sought to introduce these emails on the last day of the government's case in chief. The district court's decision to enforce the notice requirement and exclude the emails was not an abuse of discretion.

VII. The Court should similarly reject Denkberg's ineffective-assistance-of-counsel claim. For starters, the Court should decline to address the claim on direct review because further factual development is needed to assess counsel's reasons for failing to give sufficient pre-trial notice and the exculpatory nature of the evidence. Even if the Court were inclined to reach Denkberg's claim, however, it should deny it. He cannot show that counsel's performance was constitutionally deficient; nor can he show that the excluded evidence would have resulted in a different outcome. Indeed, many of the documents he sought to introduce were inculpatory.

## ARGUMENT

## I. Sufficient Evidence Supports Defendants' Convictions For Conspiracy, Mail Fraud, Wire Fraud, And Using Fictitious Names.

Novis and Denkberg contend that the evidence was insufficient to prove that they conspired to commit mail fraud, committed mail and wire fraud, and used fictitious names in the course of committing mail fraud. *See* Denkberg-Br.40-50; Novis-Br.38-47. More specifically, they contest the government's proof of a scheme to defraud, which 18 U.S.C. §§ 1341, 1342, 1343, and 1349 all have in common. In particular, they contend that no rational juror could find that (1) their misrepresentations were material, *see* Novis-Br.40-43, (2) they intended to harm their victims, *see* Novis-Br.43-47, or (3) they did not rely in good faith on the advice of counsel regarding the legality of their mailings, *see* Denkberg-Br.40-50. Each of those claims is meritless.

### A. Background

After the jury found them guilty, Novis and Denkberg moved for judgments of acquittal under Fed. R. Crim. P. 29. Dkts.103-1, 104. As relevant here, Novis and Denkberg primarily argued that they lacked the requisite intent to defraud because they relied in good faith on the advice of their attorneys regarding the legality of the prize notices. Dkt.103-1,

21

at 2-13; Dkt.104, at 4-6. Novis also argued that the notices were not fraudulent because they "conspicuously" informed customers "that they had not won anything" and because only *unreasonable* elderly persons"—as opposed to "person[s] of ordinary prudence"—were deceived. Dkt.104, at 6-9. He further contended that the fictitious names of signatories on the notices were not material. *Id.* at 9-10.

The district court denied the motions in a thorough, 62-page order. Dkt.128. The court explained that "the jury could easily find, beyond a reasonable doubt, that Defendants intended to defraud the recipients." Dkt.128, at 22. The court highlighted all of the "incriminating" features of defendants' mailings described above, *see supra*, pp. 5-7. Dkt.128, at 22. The court further explained that "[a] jury could reject, as absurd, Defendants' claim that they were running a legitimate business of selling sweepstakes reports," given the structure of their mailing schedules and the numerous customer complaints they received. *Id.* at 22-26.

As for defendants' claim that they had relied in good faith on the advice of counsel, the court explained that "the jury could find that, despite what their lawyers told them, Novis and Denkberg knew that they were tricking and defrauding people." Dkt.128, at 34. The court

stressed the "extensive evidence" of Novis's and Denkberg's fraudulent intent, from which a jury could "infer" that they "were not acting in good faith." *Id.* The court further explained that "[t]he jury could . . . find that Defendants were obtaining opinions from attorneys simply to create a paper defense." *Id.* The court found it notable that defendants "never sought any opinions about whether their conduct violated criminal laws," failed to disclose relevant facts to their attorneys, and failed to always follow their advice. *Id.* at 42-49. What advice they did receive or follow was "caveated and cursory," which the jury could have considered in weighing the reasonableness of the advice as it related to defendants' intent. *Id.* at 46. The court further observed that the jury could have rejected as not credible the testimony of defendants' attorneys, given their "professional and reputational reasons for continuing to insist that these mailings were lawful." *Id.* at 35-37.

## B. Standard of Review.

This Court "review[s] challenges to the sufficiency of evidence *de novo*," viewing "the evidence in the light most favorable to the government, drawing all inferences in the government's favor[,] and deferring to the jury's assessments of the witnesses' credibility." *United*

23

*States v. Pierce*, 785 F.3d 832, 837-38 (2d Cir. 2015) (quotations omitted).

A defendant's conviction will stand so long as "*any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### C. A Rational Juror Could Find That Defendants' Misrepresentations Were Material.

1. To prove a scheme to defraud, the government must prove

that the defendant made "material" misrepresentations. *United States*

*v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam). "A statement is

material if the misinformation or omission would naturally tend to lead

or is capable of leading a reasonable person to change his conduct." *Id.*

(quotations and brackets omitted). This reasonable person standard, also

referred to as the "ordinary prudence standard[,] . . . focuses on the

violator, not the victim." *United States v. Thomas*, 377 F.3d 232, 243 (2d

Cir. 2004). Its role is "to assure that the defendant's conduct was

calculated to deceive, not to grant permission to take advantage of the

stupid or careless." *Id.* at 242. In this way, materiality bears on a

defendant's intent, *Weaver*, 860 F.3d at 95, because "the purpose of the

element of materiality is to ensure that a defendant actually intended to

24

create a scheme to defraud," *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc).

2.    Defendants contend that their convictions should be reversed because their misrepresentations were not material.  That is incorrect.

a.  As described above, *see supra*, pp. 5-7, defendants' fake prize notices misrepresented the identity of the senders and created misleading impressions about the legitimacy of the awards.  A rational juror could find that these misrepresentations and misimpressions were material.   As defendants' artist testified, fake business names and identities, as well as other graphic design elements, were used specifically because of their potential to trick recipients into thinking they were receiving legitimate prize notices.   Indeed, those tactics worked:  countless customers believed they were winners.

Although Novis notes that one witness testified that "the names used on the mailings did not matter to her or her husband," Br.43 (citing Tr.559), this argument misses the point:  the notices were misleading not because of the specific names used but because of the impression those names created—that these notices had the imprimatur of these various companies.  As the district court observed:  "If all these mailings [had

25

been] signed by Novis or Denkberg, it is less likely that the recipients would have been deceived into believing that these were legitimate prize notices," in part because the multitude of fake company names helped obscure the fact that all of these mailings were coming from the same solitary source. Dkt.128, at 56-57.

Defendants' confusing description of what was being offered to the recipients also rendered the mailings materially misleading, particularly the descriptions of the "entrant directives" and other euphemisms for sweeps reports. A rational juror could find that those phrases directly affected the recipients' perception of the product defendants claimed they were offering—a classic example of a material misrepresentation. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970).

b. Novis concedes that his mailings "utilized false introductions," but he dismisses the use of personalization, "official looking . . . graphics," "fake, but official sounding business names," and fake signatories as tactics employed merely "to engender recipient trust." Br.42-43. And, relying on *Regent*, 421 F.2d 1174 (2d Cir. 1970), Novis contends that misrepresentations that operate solely to "engender trust"

26

are "immaterial to the 'nature of the bargain' itself" and thus "not evidence of a scheme to defraud." Novis-Br.42-43. By "nature of the bargain itself," Novis means "a curated booklet of available sweepstakes the recipient could enter . . . in exchange for a fee." Novis-Br.43.

There are at least two fatal flaws with this line of argument. First, that was not the bargain the mailings presented. Indeed, a rational juror could easily find that mailings were designed to make customers believe that they were not bargaining for anything at all—that they were instead already winners and needed only to pay a small processing fee to claim their large cash prize. That misimpression was integral to the success of the scheme, considering that Novis and Denkberg planned to provide paying customers with nothing more than publicly available information about sweepstakes. In this regard, getting their customers to "trust" in the legitimacy of their mailings was essential.

Second, defendants' reliance on *Regent* is misplaced. The defendants in *Regent* were engaged in "the business of selling stationery supplies." 421 F.2d at 1176. As "a preliminary part of the" sales pitch, defendants' salesmen would falsely claim that they "had been referred to the customer by a friend of the customer" or by "officers of [the

27

customer's] firm[]," or that they had excess stationery that needed to be "disposed of." *Id*. at 1176-77. The salesmen made these false representations to "get by secretaries on the telephone and to get the purchas[er] . . . to listen." *Id*. at 1177 (quotations omitted). Notwithstanding these false statements, however, the "price and quality of the merchandise [were] always discussed honestly." *Id*. This Court found that the "white lies" told during the initial solicitations were not proof of a scheme to defraud under 18 U.S.C. § 1341 because the defendants' "customer[s] g[o]t exactly what [they] expected and at the price [they] expected to pay." *Id*. at 1179-80. In other words, although "defendants intended to deceive their customers[,] . . . they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him." *Id*. at 1182.

Not so here. As the testimony at trial and numerous exhibits showed, the misleading language in defendants' mailings directly affected the recipient's "understanding" of what was being offered and their "assessment of [its] value." *Regent*, 421 F.2d at 1182.

28

### D. A Rational Juror Could Find That Novis And Denkberg Acted With The Intent To Defraud.

1.     Proof of a scheme to defraud also requires proof of fraudulent intent, which can be shown through direct or circumstantial evidence. *United States v. Guadagna*, 183 F.3d 122, 129-30 (2d Cir. 1999).  The government introduced overwhelming evidence from which a rational juror could find that the misrepresentations in defendants' fake prize notices were calculated to deceive recipients into believing they had won a prize.  The district court's order denying the defense motions for judgment of acquittal meticulously examined how the evidence would support such a conclusion.  Dkt.128, at 9-23.

First, a rational juror could infer fraudulent intent from the design and substance of the mailings themselves.  As the district court observed, defendants employed numerous tactics to "trick recipients and convey the same false message—that the recipient had won money and needed to pay a fee [to] obtain their winnings."  Dkt.128, at 9.  The "prize notices appeared to be personalized to the recipients and included fake business names," "fictitious identifies of purported officials," and "graphics, logos, borders, seals, and stamps that were intended to make the documents look official and engender trust."  *Id.* at 15; *see, e.g.*, Ex.129-37; Tr.745-

29

46, 793. Some were crafted to look like checks, financial statements, stock certificates, and other official documents. They also included fake file numbers, customer numbers, and confirmation numbers, all of which gave the misimpression that defendants' business operation was legitimate. A rational juror could find that these layers of personalization were intentionally employed to make it seem as if the prizes were available to recipients only because of their status as verified beneficiaries.

Defendants' notices were also full of "misleading and deceptive language, grammar, graphics, and formatting that a jury could find were intended to trick the recipient into believing that they had won money." Dkt.128, at 15. For example, Novis and Denkberg told recipients that they were a "SELECTED WINNER" whose "PAY" was "GUARANTEED." Ex.129, at 4. Recipients were also informed that these notices were "non-transferable," *e.g.*, Ex. 119, at 4, and they were urged to respond "right away," *e.g.*, Ex.102, at 2.

The notices also used "confusing and inscrutable language" to obscure the true nature of the product they would send to paying customers. Dkt.128, at 15. Instead of forthrightly describing the

sweepstakes booklets, defendants used terms like "Actual Prize Entry Directives Report," "Entrant Procedure and Compliance directives," and "Data and Report delivery proceedings." Ex.119, 130, 131. This language is inherently deceptive insofar as it avoids being "too true" about the sweeps report booklets that defendants sent their victims. *See* Tr.780.

To be sure, defendants' notices contained certain disclaimers. But these were invariably placed and printed to minimize their importance and to make them difficult to read. For example, defendants' artist used a lighter font color and blocky paragraphs of text to make the disclaimers appear unnecessary and boring. *See* Tr.764-66, 779-80, 786-90. A rational juror could find that their placement and design intentionally rendered these disclaimers ineffective, as demonstrated by both the success of defendants' scheme and the number of consumer complaints they received.

That so many consumers were "actually victimized" by defendants' notices is also "good evidence" of defendants' "intent." *See Regent*, 421 F.2d at 1181. Victims testified that they responded to defendants' mailings because they "thought" they "had won" "[l]arge sums of money" and would get their prize winnings if they paid the requested fees. Tr.82,

31

590-91. Relatives of other deceased victims testified that these victims believed they had "won the lottery" or other prizes and "had to send [a] certain amount of money to have it released." Tr.316-17, 463-64; *see also, e.g.*, Tr.340-41, 357.

In addition, there was ample evidence that defendants received an onslaught of other consumer complaints. Defendants' own employees testified as much, with one employee explaining that "customers were feeling misled." Tr.608, 679-81; Ex.170. Other complaints reached the defendants by letter notification from state offices of attorneys general. *E.g.*, Tr.1126, 1128. Novis's and Denkberg's activities also gave rise to an investigation by the U.S. Postal Service, which culminated in signed cease-and-desist agreements, where defendants promised to abandon their scheme.

These complaints, letters, and cease-and-desist agreements put defendants on notice that their behavior was misleading and unlawful. *See United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) (explaining that "complaints about illegal practices by [defendant's] business served to put [him] on notice of their potential illegality"); *Weaver*, 860 F.3d at 92 (noting frequency of customer complaints); *United States v. Press*, 336

32

F.2d 1003, 1011 (2d Cir. 1964) (complaints are "relevant on the issue of [the defendant's] intent"). Yet the defendants never altered their practices in response, even after signing cease-and-desist agreements. The jury was free to infer from this evidence that Novis and Denkberg possessed the requisite intent to defraud. *Moseley*, 980 F.3d at 27 (defendant's decision to "continue[] to operate his business despite [being on] notice makes the complaints probative of his intent to violate the law"); *Press*, 336 F.2d at 1011 (explaining that "continued operation despite . . . knowledge that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which Buy-Rite conducted its affairs" "showed the existence of a scheme to defraud").

2.    Novis nevertheless contends that he lacked the requisite intent because he never intended to harm his victims. Novis-Br.43-47. According to Novis, he meant no harm because mailing recipients got what they bargained for: a booklet containing available sweepstakes contests that they could enter. Novis-Br.45.

A rational juror could reject that assertion, finding instead that Novis intended for the recipients to mistakenly believe that they would

receive the large cash sums advertised in defendant's mailings—not a mere sweepstakes booklet. Novis's reliance on *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), and *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), is therefore misplaced, as neither involved instances of customers receiving something completely different from what they believed was offered to them.

## E. A Rational Juror Could Have Rejected Defendants' Advice-Of-Counsel Defense.

Denkberg primarily contends that he lacked fraudulent intent because he reasonably relied on the advice of counsel regarding the legality of their mailings.[4] Denkberg-Br.40-50. The evidence amply supported a rational juror's rejection of that claim. That is incorrect.

1. "[I]f believed," evidence that a defendant relied on the advice of an attorney that his conduct was lawful "can raise a reasonable doubt in the minds of the jurors about whether the government has proved" intent. *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). But "legal advice does not under all circumstances constitute an impregnable wall of defense." *Linden v. United States*, 254 F.2d 560, 568 (4th Cir.

---

[4] Insofar as Novis joins this argument, the government's responses apply with equal force.

34

1958). Instead, the advice-of-counsel defense can negate intent where the defendant: (1) sought the advice in good faith, (2) disclosed to the attorney all material facts, and (3) relied on and followed the advice in good faith. *Scully*, 877 F.3d at 476. The jury may consider these elements in conjunction with the reasonableness of the attorney's advice. Because "the advice-of-counsel defense is not an affirmative defense," a defendant does not bear the burden of proving his good faith reliance; it is up to the government to prove intent notwithstanding the asserted advice-of-counsel defense. *Id.* Ultimately, whether the advice negates intent is a question "for the jury to decide." *Id.* at 477.

2. Given the extensive evidence demonstrating defendants' fraudulent intent, a rational juror could find that the defendants acted with the intent to defraud notwithstanding the legal advice they received.

Fundamental to the question of advice of counsel is the issue of good faith, which can be demonstrated if defendants had an "honest belief in the truth of the representations [they] made." Tr.1880. At trial, defendants argued that they acted in good faith simply because they sought legal advice and acted on it. *See, e.g.*, Tr.1068. But overwhelming

35

evidence demonstrates that a rational juror could have concluded otherwise.

Lack of good faith is evident from the prize notices themselves, which are written in confusing, dense language with intentionally confusing jargon like "entrant directives" that only defendants could define, in place of plain language that sounded "too true." Tr.780. Indeed, defendants were well-aware of the necessity to withhold truthful statements in order to maximize their profits.

The Defendants' receipt of voluminous complaints also provided the jury with sufficient grounds to conclude that the defendants lacked good faith, particularly where the complaints did not prompt any meaningful changes in the defendants' business practices. *See Press*, 336 F.2d at 1010. Defendants' chosen response to these complaints—sending victims a letter that informed them that they had "misunderstood" the prize notices and could request a refund, instead of revising their mailings to make them less deceptive to other recipients—could also permit a rational juror to conclude that defendants were aware that their prize notices deceived people into sending money, and in the absence of any

change to their business practices over many years, that the defendants intended that result.

A rational juror could also reject defendants' advice-of-counsel arguments because the evidence proved that defendants did not make full and accurate reports to their attorneys about all of the material facts that they knew. For example, defendants did not disclose their mailing schedules, which was a critical component of their scheme: those schedules would have revealed that defendants quickly and repeatedly bombarded responding victims with additional prize notices under the cover of different fictitious names. *E.g.*, Tr.152-67, 864, 1154-69. Defendants also did not share all complaints they received with their attorneys. One of their attorneys testified that he recalled seeing fewer than a dozen complaints over more than a decade, Tr.850, 854-55, even though the evidence presented at trial demonstrated the defendants received many more than that. Novis's own email to Phillips (Ex.360) demonstrated his withholding of various critical pieces of information from anyone besides Phillips. A rational juror could conclude that defendants withheld all of this information to avoid advice that may have rendered their scheme ineffective.

37

A jury could also find a lack of good faith in light of evidence demonstrating that defendants did not always accept the legal advice they received. *Compare, e.g.*, Dkt.103-3, at 140 (advising against the term "Accounting Department"), *with, e.g.*, Ex.135 (using "Accounting Offices").

3.. Denkberg's contrary arguments also fail. Denkberg leans heavily on the fact that he and Novis were advised to follow the "reasonable consumer" standard for evaluating whether their mailings were misleading. Denkberg-Br.43. But the jury reasonably rejected this argument at trial. Indeed, a rational juror could find defendants' reliance on their attorneys' advice unreasonable in the face of countless consumer complaints and their attorneys own admissions that the advice they provided was specific to the civil context and did not address criminal liability. *E.g.*, Tr.907, 1556-67.

Novis and Denkberg both contend that they acted in good faith because all mailings were submitted for review by counsel and all edits were incorporated. *See* Denkberg-Br.46, 48-49; Novis-Br.30. But they ignore the mailings that remained unchanged, even after defendants were advised that some of the language could lead a recipient to believe

38

the prize notices were legitimate offers of payment. *E.g.*, Ex.135; Ex.103-3, at 140.

Finally, Novis and Denkberg rely on their own self-serving statements to their attorneys—that they "never want[ed] to be found to have violated a Government order," Tr.1522, and wanted to follow the law, Tr.1523. Of course, the jury was free to reject these assertions, particularly in light of other evidence demonstrating their fraudulent intent.

## II. Sufficient Evidence Supports Defendants' Convictions For Aiding And Abetting Mail Fraud.

Novis and Denkberg next argue that insufficient evidence supports their convictions for aiding and abetting similar mail fraud schemes run by Shawn Phillips, Philip Priolo, and Jeffrey Novis. Denkberg-Br.50-52; Novis-Br.55-56. Those assertions are meritless.

### A. Background

Novis's and Denkberg's motions for judgments of acquittal challenged the sufficiency of the evidence supporting their convictions for aiding and abetting. They focused on a lack of evidence that defendants saw the actual prize notices that Phillips, Priolo, and Jeffrey Novis mailed. *See* Dkt.103-1, at 14; Dkt.104, at 10-11. Denkberg claimed in

39

the alternative that because he knew his own mailings had been approved by both PacNet and his lawyers, he had no basis to suspect that Phillips's, Priolo's, and Jeffrey Novis's mailings had not. Dkt.103-1, at 15.

The district court rejected these arguments, explaining that "there was ample direct and circumstantial evidence that Defendants aided and abetted mail fraud." Dkt.128, at 58. In particular, the court highlighted the shared customer lists and shared employees and defendants' joint control over those employees. *Id.* The court acknowledged that "there was no direct evidence that Defendants saw, in full, the prize notices used by Phillips, Jeffrey Novis, and Priolo," but the court explained that there was "sufficient direct and circumstantial evidence for a jury to find that both Defendants knew that these three individuals were sending fraudulent prize notices, which were similar to Defendants' own notices." *Id.* at 58-60 (noting the pre-print copies of notices that Denkberg received). The court also noted the "powerful circumstantial evidence" of defendants' "knowledge about the content of these mailings." *Id.* at 60-62.

40

## B.     Standard Of Review.

Like their challenges to the other counts of conviction, defendants'
sufficiency challenge to the aiding and abetting counts is reviewed de
novo, viewing the evidence in the light most favorable to the jury's
verdict, and reversing only if no rational juror could find them guilty.

## C.     A Rational Juror Could Find That Defendants Aided
And Abetted Mail Fraud.

1.     To convict a defendant of aiding and abetting a substantive
offense under 18 U.S.C. § 2, the government must prove that (1) the
underlying crime was committed by someone other than the defendant
and (2) the defendant either acted with the specific intent of advancing
the commission of the crime. *United States v. Smith*, 198 F.3d 377, 383
(2d Cir. 1999); *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996).
To prove that a defendant acted with that specific intent, the government
must prove that he knew of the proposed crime.  *United States v. Best*,
219 F.3d 192, 199 (2d Cir. 2000).  The defendant, however, "need not
know all of the details of the crime . . . if the evidence shows that he joined
in the venture, shared in it, and that his efforts contributed towards its
success." *Id.* at 199-200 (quotations omitted); *see also United States v.
Wiley*, 846 F.2d 150, 154 (2d Cir. 1988).

41

2.     As the district court correctly recognized, the government presented overwhelming evidence to the jury in support of these elements.

First, the government's evidence at trial demonstrated that Phillips, Priolo, and Jeffrey Novis were engaged in schemes to defraud and that the defendants knew it.  The government introduced numerous examples of Phillips, Priolo, and Jeffrey Novis's prize notices, which employed strikingly similar graphic design techniques and deceptive language as Novis and Denkberg's fraudulent notices.  The jury also heard evidence from which they could infer that both Novis and Denkberg saw at least some of these mailings or were aware of their nature.  For example, employees sent Denkberg emails attaching drafts of Phillips', Priolo's, and Jeffrey Novis's mailings.  These draft mailings shared the same fraudulent features of defendants' prize notices.  Although Denkberg dismisses these mailings as "pre-prints" lacking in "the actual text of the promotions utilized by Phillips, [Jeffrey] Novis, or Priolo," Denkberg-Br.51, they sufficed to put Denkberg on notice of the nature of Phillips's and Priolo's and Jeffrey Novis's schemes.  Indeed, Novis had firsthand knowledge that his father had received complaints

from a state attorney general. *See* Ex.410 (email from Novis to Jeffrey and Priolo informing them that an attached letter from the Minnesota AG's Office was "in [their] PO Box"). Defendants knew so much about these individuals' schemes that Novis and Denkberg consulted with their attorney—Andrew Lustigman—who noted his "concern" about Phillips, Priolo, and Jeffrey Novis's activities and advised Novis and Denkberg that they should take some steps to avoid being "implicate[d]" in their activities. Tr.1577-79; Ex.268.

In addition to finding defendants' knowledge of these individuals' fraudulent scheme, a reasonable juror could also find that defendants provided material assistance to Phillips, Priolo, and Jeffrey Novis. For example, Novis directed his and Denkberg's employees to perform work for Phillips, Priolo, and Jeffrey Novis. *See* Tr.119-21. These employees performed the same critical tasks for these individuals as they did for Novis and Denkberg: monitoring inventory, scheduling mailings, proofreading the notices, and sorting the payments and responses that they received.[5] Tr.111, 115-16, 521, 531, 692. Denkberg also provided

---

[5] Although it was Novis who instructed the employees to work for Phillips, Priolo, and Jeffrey Novis, Denkberg shared an office with Novis

advice for Phillips's mailing schedules, *see* Ex.370 and 370A. Novis, Denkberg, Phillips, Priolo, and Jeffrey Novis shared customer mailing lists with each other. Tr.649-50. Indeed, as soon as one of Novis and Denkberg's customers responded to their prize notices, Novis and Denkberg would share that customer's mailing information with Phillips, Priolo, and Jeffrey Novis, and vise-versa. *Id.* These acts of assistance—directing their own employees to perform services for Phillips, Priolo, and Jeffrey Novis, and supplying the three with additional names and addresses—were essential to ensuring that Phillips's, Priolo's, and Jeffrey Novis's frauds could operate and accordingly contributed to their success.

3. Defendants' contrary arguments lack merit. Novis and Denkberg primarily contend that their convictions should be reversed because they had no reason to think that Phillips, Priolo, and Jeffrey Novis were doing anything illegal and therefore lacked the intent to aid and abet their crimes. Denkberg-Br.52; Novis-Br.56. This argument

---

near their employees. Tr.119-21. The jury could reasonably infer that both Novis and Denkberg knew what their employees were doing.

rests on the same advice-of-counsel defense addressed above and fails for largely the same reasons. *See supra*, pp. 35-39.

Denkberg contends that he could not have intended to aid or abet Phillips, Priolo, and Jeffrey Novis's crimes because he was aware that PacNet's compliance team reviewed all mailings, and therefore had no reason to believe that the mailings were unlawful. The jury was presented with this argument and properly rejected it. PacNet is a payment processor located in Canada, not a law firm with specialized experience in criminal fraud. Insofar as defendants relied on PacNet's advice, that reliance was not reasonable, particularly in light of the countless consumer complaints they received and the cease-and-desist agreements that they signed.

Defendants also contend that no rational juror could find that they had seen or knew about the nature of Phillips, Priolo, and Jeffrey Novis's mailings. But that argument directly contradicts the direct and circumstantial evidence presented at trial showing the opposite: among other things, the pre-prints that Denkberg received; his willingness to provide advice to Phillips, Priolo, and Jeffrey Novis; the arrangements to share employees and mailing lists; and the consumer complaints of which

45

Novis was aware. A rational juror could infer from this evidence that Novis and Denkberg knew about the fraudulent nature of Phillips's, Priolo's, and Jeffrey Novis's schemes.

## III. The District Court's Supplemental Jury Instructions Were Free From Error.

Defendants raise several challenges to the district court's supplemental jury instructions. Novis contends that the instruction misconstrued the element of good faith and failed to remind the jury of the government's burden. Novis-Br.26-38. Denkberg contends that the instruction permitted the jury to reject Denkberg's advice-of-counsel defense "based upon a mere showing that [his] promotions contained *nonmaterial* false statements," Denkberg-Br.31-37. He also contends that the supplemental instruction was "inadequate" because it did not remind jurors that the government had to prove materiality, and therefore "conveyed to the jury that a material misrepresentation was not strictly necessary to convict." Denkberg-Br.37-40. Under any standard of review, defendants' claims fail because the district court's supplemental instruction was not erroneous.

46

## A.    Background.

At the close of trial, the district court gave standard jury instructions that defined "scheme to defraud," "intent to defraud," and materiality.  Dkt.155 at 21-24; Tr.1873-79.  The court explained that a scheme to defraud is "any plan to deprive someone of money or property by trick, deceit, deception or swindle that is reasonably calculated to deceive persons of average prudence." Tr.1875.  "Intent to defraud means to act knowingly and with specific intent to deceive for the purpose of causing some financial or property loss to another." Tr.1878.  The court explained that "it is no defense that the customer fell prey to the fraudulent scheme because he or she failed to act vigilantly," and "[w]hether or not a particular victim acted foolishly is irrelevant." Tr.1879.  Rather, the "crucial question is whether a defendant was involved in a scheme where he made material false statements or failed to disclose material information, and did so with an intent to defraud and harm victims." *Id.*  As for materiality, the court instructed that a "material fact is one which would reasonably expect to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." Tr.1876.  The court contrasted material

47

statements with "[m]ere puffery," "upon which no reasonable buyer would be justified in relying." *Id.*

The court also instructed the jury on good faith. The court stated: "Since an essential element of these crimes is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail or wire fraud." Tr.1879. "The burden of proof is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt." Tr.1880. The district court then discussed good faith in the context of a reliance-on counsel-defense: "If the defendant . . . relied in good faith on the advice of an attorney that his conduct was lawful, then he lacked the intent to defraud required to prove the offenses." Tr.1880-81. The court further explained:

> A defendant relies in good faith on the advice of counsel if:
>
> 1. Before taking action he, in good faith, sought the advice of an attorney whom he considered competent to advise him on the matter.
>
> 2. He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct.
>
> 3. He made a full and accurate report to his attorney of all material facts that he knew; and
>
> 4. He then acted strictly in accordance with the advice of this attorney. He must in good faith honestly follow such advice, relying on it and believing it to be correct.

Tr.1881.

During jury deliberations, the district court received a note from the jury, asking:

> (1) Can you explain further or clarify "average prudence," and can a person be purposefully misleading but not have *intent* to break the law as . . . advise [sic] of counsel said they were within the law.

> (2) Page 21 [of the district court's instructions] the top paragraph about "scheme to defraud" having to be "calculated to deceive persons of average prudence." Does that mean that it is legal to intentionally be predatory towards vulnerable people and execute a scheme to defraud people below average prudence?

Dkt.95, at 2-3.

In reply, the district court provided a supplemental instruction. As relevant here, in response to the juror's question regarding average prudence, the court reiterated its previous instruction that defined "scheme to defraud" and stated:

> Statements made by a defendant that would have deceived a person of ordinary prudence may be evidence that the defendant actually intended to deceive the recipients. Proof that a defendant created a scheme to deceive reasonable people can be sufficient evidence that the defendant acted with an intent to defraud. A defendant can also act with intent to defraud if the defendant intended to deceive the ignorant or gullible.

Tr.1950-52.

49

In response to the juror's question regarding purposefully misleading conduct, the court reiterated its instruction on intent and stated that "[e]vidence that a person engaged in purposefully misleading conduct may be evidence that the person acted with an intent to defraud." Tr.1951.

Finally, with respect to the advice-of-counsel defense, the court reminded jurors that it had "previously instructed [them] about good faith reliance on counsel" and that they "must follow all of those instructions." Tr.1951. The court also stated that "[a] person who acts with an intent to defraud cannot also at the same time act in good faith." *Id.* Thus, "a person who acts with an intent to defraud cannot rely on advice of counsel in good faith," but "[i]f the defendant relied in good faith on the advice of an attorney that his conduct was lawful, then he lacked an intent to defraud." *Id.* The court reiterated that the jury "should consider and follow all of [the court's] original instructions on the law." Tr.1951-52.

Novis and Denkberg objected to the language of the supplemental instruction. Denkberg contended that the court's instruction pertaining to the innocent and gullible was "not necessary" and prejudicial. Tr.1945-

50

46. Novis added that the advice-of-counsel instruction "completely negates the defense." Tr.1947-48. Neither objected to the absence of a materiality instruction, and neither requested specific language regarding materiality.

## B. Standard Of Review.

Preserved claims of instructional error are reviewed de novo and will merit reversal "only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (quotations omitted). Contrary to Novis's assertion (Novis-Br.26-27), the burden of proving prejudice lies with the defendant. *Gershman*, 31 F.4th at 99.

Novis preserved his current challenges to the district court's advice-of-counsel instruction by raising those same concerns below. Denkberg, on the other hand, did not object to any part of the supplemental instruction on materiality grounds. His present challenge is therefore reviewable only for plain error. *See, e.g.*, *United States v. Miller*, 954 F.3d 551, 557 (2d Cir. 2020). On plain-error review, Denkberg bears the burden to establish (1) error that (2) was "clear or obvious," (3) "affected the defendant's substantial rights," and (4) "seriously affect[ed] the

51

fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 134-35 (2018) (quotations omitted).

### C. The District Court Committed No Reversible Error With Its Supplemental Instructions.

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Gershman*, 31 F.4th at 99 (quotations omitted). "[T]he legal sufficiency of the supplemental charge must be assessed in the context of the instructions as a whole." *United States v. Velez*, 652 F.2d 258, 261 (2d Cir. 1981). A court need not restate an original instruction in its "supplemental charge . . . where the trial judge explicitly cautions the jury that the supplemental instruction is an adjunct to, and not a substitute for, the original charge." *Id.* at 261-62. Finally, "a supplemental charge is not defective where it responds adequately to the jury's request for clarification." *Id.* at 262. Defendants cannot show that the district court's supplemental instruction was erroneous, let alone plainly so.

### 1. The district court properly instructed the jury on good faith.

The district court's supplemental instruction mentioned good faith twice: first, in the more general sense, as it relates to a defendant's fraudulent intent, and second, in the more specific sense, as it relates to a defendant's good faith reliance on counsel. Neither aspect of the court's instruction was erroneous.

a. The court's general instruction—that "a person who acts with an intent to defraud cannot also at the same time act in good faith"—was no different from the court's initial charge, jointly proposed by the parties, which advised the jury that a defendant with "fraudulent intent [has a] consequent lack of good faith." Tr.1880, 1951; Dkt.67, at 39. The court's supplemental instruction on this point was also legally correct: a defendant cannot be found guilty of fraud if he acted in good faith.

The court's more specific good faith instruction—that a defendant who relies in good faith on the advice of counsel lacks the intent to defraud—was also legally sound, as it flowed directly from this Court's decisions describing the interaction between the good faith reliance on advice of counsel and a defendant's lack of intent to defraud. *See, e.g.*, *Scully*, 877 F.3d at 476 (explaining that "the claimed advice of counsel . . .

53

can raise a reasonable doubt in the minds of the jurors about whether the government has proved . . . that the defendant had an 'unlawful intent'").

b. Novis is therefore simply mistaken in arguing that the court's instruction was misleading and "incomplete." Novis-Br.36-37. He is also incorrect in contending that the district court's instruction "conflated the required *mens rea* (intent to defraud) with good faith and an advice of counsel defense, improperly shifting the burden to Mr. Novis." Novis-Br.31. His argument is difficult to parse, but Novis appears to contend that: (1) the instruction implied that a defendant who acts with the intent to defraud cannot assert an advice of counsel defense; and (2) the instruction impermissibly placed the focus on a defendant's "acts," which suggested that acting in good faith was an affirmative defense with the burden of proof lying with the defense. *See* Novis-Br.32.

Novis misreads the court's instruction, which did neither of those things. The court's statement that "a person who acts with an intent to defraud cannot rely on advice of counsel in good faith" was an accurate statement regarding the interaction between intent and good faith reliance. Put simply: a person acting with the intent to defraud necessarily did not rely in good faith on the advice of his counsel.

54

Novis is also mistaken in asserting that the instruction shifted the burden of proof to the defense. The instruction neither explicitly nor implicitly did so, and no rational juror could have misconstrued it in this way.

None of the cases on which Novis relies supports a contrary view. In *United States v. Greenspan*, 923 F.3d 138 (3d Cir. 2019), for example, the jury was advised: "To *avail himself* of the advice of counsel defense, the defendant has to *demonstrate* from the evidence each of the prerequisites of the defense." *Id.* at 147 (quotations omitted). This language "erroneously suggested that Greenspan bore the burden of disproving his mental state." *Id.* The same was true of the court's alibi charge in *Simmons v. Dalsheim*, which instructed the jury that they needed to "be satisfied as to the truth of the alibi" and "determine whether or not the alibi should be believed"—language that could reasonably be "understood . . . as imposing a burden of persuasion on Simmons with respect to his alibi defense." 543 F. Supp. 729, 738-39 (S.D.N.Y. 1982), *aff'd*, 702 F.2d 423 (2d Cir. 1983). The court's instruction here created no such misimpression regarding the government's burden.

Novis also appears also to contend that the court's instruction was flawed because "[g]ood faith, as it relates to the jury's consideration[,] is limited to the defendant's good faith *reliance* on the advice *received*, not on a defendant's *state of mind* when *soliciting* that advice." Novis-Br.22, 33 (quotations omitted). He is incorrect. In evaluating an advice-of-counsel defense, jurors "must ask . . . whether the defendant honestly and *in good faith sought the advice* of a competent lawyer as to what he may lawfully do" and "whether in good faith he honestly followed such advice." *Scully*, 877 F.3d at 477 (emphasis added) (quoting 1 Leonard B. Sand, et al., *Modern Federal Jury Instructions: Criminal*, Instruction 8-4, at 8-19 (2017)).

Finally, relying on *Scully*, Novis contends that the instruction was incomplete because the district court "failed to remind the jury of the Government's burden." Br.31-32. But the district court did remind jurors that they should follow all of its previous instructions, which included an instruction on the government's burden as it related to the advice-of-counsel defense. *Scully* did not hold that supplemental instructions must include an explicit reminder of the government's burden. Indeed, *Scully* did not involve supplemental instructions at all,

56

let alone ones that refer back to undisputed initial instructions. Instead, in its one and only charge to the jury, the district court in *Scully* instructed "that *the defendant* has to satisfy the . . . elements [of the defense] to sustain the defense of advice of counsel." 877 F.3d at 472 (emphasis added). That language, which explicitly put the onus on the defendant to prove good faith reliance on the advice of counsel, was manifestly erroneous, and this Court held that the district court should have instructed on the burden of proof to correct that misimpression. *Id.* at 476-78. No such error occurred here.

### 2. The district court did not plainly err by not repeating its instruction on materiality.

Denkberg also challenges the district court's supplemental instruction on two separate but related grounds: he contends that the court's reference to the "ignorant and gullible" "incorrectly suggested that Denkberg could not avail himself of an advice-of-counsel defense to the extent that he understood his promotions contained even non-material misrepresentations." Denkberg-Br.32, 36. By "non-material misrepresentations," Denkberg appears to mean representations that would deceive "even the most credulous or unsophisticated consumer—regardless of whether such interpretation was reasonable." *See*

57

Denkberg-Br.34-36. Putting it together, Denkberg argues that "[t]he jury was told that the availability of the advice of counsel defense depended—not on whether the Defendant actually believed his promotions were *legal*—but whether he understood that they were *misleading* to *any* member of society." Br.36. In a similar vein, Denkberg also argues that the court's instruction implied "that the Government was not actually required to prove a material misrepresentation." Br.32. Neither objection was made in district court, and his arguments cannot survive plain-error review.

a. It is unlawful to intentionally deceive even the gullible, as the district court's supplemental instruction made clear. Although the fraud statutes reference individuals of ordinary prudence, the "role of the ordinary prudence and comprehension standard [in the materiality element] is to assure that the *defendant's* conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless." *Weaver*, 860 F.3d at 95 (quotations omitted). Indeed, "[i]n a related context," this Court has "held that a defendant is liable for an objectively absurd lie if a subjectively foolish victim believes it." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013) (per curiam) (citing

58

*United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). Were it "[o]therwise[,] the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim," but that is not the law. *Thomas*, 377 F.3d at 243 (quotations omitted). At a minimum, the district court's instruction noting that a defendant "can also act with intent to defraud if the defendant intended to deceive the ignorant or gullible" was not clearly or obviously mistaken.

The district court's instruction on this score also did not undercut defendants' advice-of-counsel defense. As explained above, the court's advice-of-counsel supplemental instruction was not erroneous. To avoid any confusion, the district court explicitly directed the jury back to its initial advice-of-counsel instruction. Where, as here, the district court referred to its original advice of counsel charge and advised the jury that its instruction only supplemented the initial charge, there can be no error. *See United States v. Valencia*, 645 F.2d 1158, 1166 (2d Cir. 1980).

b.    Denkberg's arguments to the contrary misconstrue the materiality requirement. Relying on *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018), he contends that intent to defraud must be "based upon an intent to deceive the *reasonable* consumer," not "the ignorant or

59

gullible." Denkberg-Br.35-36 (quotations omitted). But this argument confuses the standard for materiality with the standard for intent. As this Court has explained, "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme." *Weaver*, 860 F.3d at 95. In any event, *Litvak* applied a reasonable-investor standard for materiality in a case involving securities fraud; Denkberg has not shown that such a standard plainly applies to the charges at issue here. And even if he could, that standard would be of no help to Denkberg, given that the jury heard evidence from which they could infer that defendants' misstatements *did* mislead individuals of ordinary prudence. E.g., Tr.470-71 (testimony by granddaughter of victim that her "understanding is that it looks like [her grandfather] was going to win [$1.9 million] if he sent in the $29.99 check"). In this regard, Denkberg is mistaken in contending that the fake prize notices were not "so exaggerated that no reasonable buyer could justifiably rely on them." Denkberg-Br.34 (quoting *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023)).

Denkberg contends in the alternative that even if the district court's intent-to-defraud description were correct, the instruction was still "inadequate, because it failed to include a simultaneous reminder that, in addition to intent, the Government *still* had to prove" materiality and thereby effectively "relieved prosecutors of the burden of proving" materiality. Denkberg-Br.38, 40. But this added reminder on materiality—which neither defendant requested—was not clearly or obviously required where the instruction was neither "incomplete" nor "misleading," *United States v. Daugerdas*, 837 F.3d 212, 228 (2d Cir. 2016) (quotations omitted), and where the district court referred the jury back to its original charge. Denkberg's reliance on *Uzoukwu v. City of N.Y.*, 805 F.3d 409 (2d Cir. 2015), and *Velez*, 652 F.2d 258, is therefore unavailing, as both cases involved instructions that were incorrect and incomplete. *See Uzoukwu*, 805 F.3d at 417 (implying incorrectly that defendant's silence constituted obstruction where defendant had a constitutional right not to respond to police questions); *Velez*, 652 F.2d at 262 (recharging the jury on most of the "essential elements" of conspiracy, but leaving the mens rea element out entirely, thereby implying that it was not required).

### 3. Any error was not prejudicial.

Even if the court's supplemental instruction were erroneous, defendants would not be entitled to reversal because they suffered no prejudice. As explained above, overwhelming evidence demonstrated defendants' guilt. *See supra*, pp. 21-46. In light of this evidence, any errors in the court's supplemental instruction could not have influenced the jury's verdict.

## IV. The District Court Did Not Abuse Its Discretion In Admitting Out-Of-Court Statements Regarding Victims' Beliefs About Defendants' Fraudulent Prize Notices.

Novis contends (Br.48-52) that the district court erred by permitting testimony that certain victims who responded to defendants' notices believed that they had in fact won a prize. He is mistaken.

### A. Background.

Prior to trial, the government gave notice of its intent to offer victim testimony "to show that the defendant's mailing had the intended effect on the victim"—namely, that these victims "were defrauded." Dkt.51, at 26. Because some of defendants' "elderly and vulnerable" victims "ha[d] passed away since [the indictment], and others [were] infirm to the point of being unable to testify," the government explained that it would "call family members of the[se] victims" to testify as to the victims' "belief[s]

62

concerning the prize notices [they] received." *Id.* at 26-27. The government explained that these statements were "offered for the non-hearsay purpose of demonstrating their beliefs, and not for the truth of the matter asserted." *Id.* at 27. Alternatively, the government noted that the statements would be admissible under Federal Rule of Evidence 803(3), "as evidence of the declarant's state of mind." *Id.*

Defendants raised hearsay objections to this line of proposed testimony pretrial. Dkts.58, 60. The court declined to address the objections pre-trial, although it noted that "testimony from the family members recounting statements from the victims concerning the victims' beliefs about the prize notices they received would be admissible because such testimony concerns the victim's state of mind" under Rule 803(3). Dkt.63, at 1. Defendants re-raised their objections to most of the testimony at trial, and the district court overruled them. Tr.316-17, 340. As a consequence, two individuals whose relatives were victimized by defendants' scheme were permitted to testify that their family members believed that they had "won the lottery." Tr.317; *see also* Tr.340-41 (witness describing that her father "belie[ved]" that "he was a winner"). A third relative testified that her father "believed that he had won a

prize, and that he was just waiting for it to arrive," Tr.463, but defendants did not object to this testimony.

### B. Standard Of Review.

This Court reviews preserved "evidentiary rulings for clear abuse of discretion, requiring a showing of manifest error before . . . taking any further action on appeal." *Moseley*, 980 F.3d at 27 (quotations omitted). Unpreserved challenges to evidentiary rulings are reviewed for plain error. *United States v. Cedeno*, 756 F. App'x 24, 28 (2d Cir. 2018). Whether a statement is hearsay is a legal question that this Court reviews de novo. *See United States v. Ferguson*, 676 F.3d 260, 285 (2d Cir. 2011).

### C. The District Court Properly Admitted Victims' Beliefs About Defendants' Prize Notices.

The district court did not abuse its ample discretion or otherwise plainly err when permitting the relatives' testimony.

1.    As an initial matter, this testimony was admissible non-hearsay, as it was offered for the non-truth purpose of demonstrating the victims' state of mind.  The rule against hearsay bars only those out-of-court statements offered for their truth.  *See* Fed. R. Evid. 801(c). Statements "offered as circumstantial evidence of [the declarant's] state

64

of mind," on the other hand, "do[] not fall within" the definition of hearsay because they are "not offered to prove the truth of the matter asserted." *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988); *see also United States v. Southland Corp.,* 760 F.2d 1366, 1376 (2d Cir. 1985) ("[A] state of mind can be proved circumstantially by statements . . . which are not intended to assert the truth of the fact being proved." (quotation omitted)). In this case, the government offered the victims' beliefs about winning a large prize to show the effect the fraudulent prize notices had on the victims' state of mind, not to prove the truth that those beliefs asserted. *See* Dkt.51, at 26-27.

Although the district court did not address the government's non-hearsay argument below and instead relied on Rule 803(3), *see* Dkt.63, at 1, this Court can uphold the decision of the district court "on any grounds supported in the record, even if it is not one on which the trial court relied." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006); *see also Southland*, 760 F.2d at 1376 (observing that "[w]hen a declaration is admitted only to prove a relevant state of mind, it does not appear to matter . . . whether admissibility is predicated on the

65

declaration not being hearsay . . . or under the [Rule 803(3)] hearsay exception for declaration of states of mind").

2.    In any event, the district court properly admitted the statements under Federal Rule of Evidence 803(3).  That rule sets forth an exception to the usual rule barring hearsay testimony.  Under that exception, a court may admit "[a] statement of the declarant's then-existing state of mind."  Fed. R. Evid. 803(3).  Statements of belief are also admissible under Rule 803(3), so long as the statement of belief is not offered to "prove the fact . . . believed" (with one exception not relevant here).  *See id.*  In other words, a statement of belief is admissible to prove the declarant's mental state—that he held a particular belief— but not "to prove the truth of the fact underlying the . . . belief."  *Wagner v. County of Maricopa*, 747 F.3d 1048, 1053 (9th Cir. 2013); *see also United States v. Mazer*, 631 F. App'x 57, 64 (2d Cir. 2015) (statement that "he was in a partnership" was not admissible under Rule 803(3) to prove declarant did indeed have a "pre-existing partnership interest").

Here, the government offered statements made by several of defendants' victims that they believed they had won the lottery or other large sums—not to prove the fact believed (*i.e.*, that the victims really

66

had won substantial sums), but rather to show that, upon reading defendants' confusing and misleading mailers, the victims *believed* they had won prize money. That was a permissible application of Rule 803(3), and the district court did not abuse its discretion in allowing the testimony. *See, e.g.*, *United States v. Harris*, 733 F.2d 994, 1004 (2d Cir. 1984) (testimony that the declarant "believed [someone had] brought an agent to him" was admissible under Rule 803(3) because it demonstrated "the declarant's then existing state of mind") (quotations omitted).

2.     Novis contends (Br.51) that the statements were improperly admitted under Rule 803(3) as proof that "Novis intended" for "recipients [to be] deceived into believing they won cash prizes." According to Novis, Rule 803(3) does not permit the introduction of statements "'to provide an inference of the happening of [an] event that produced the state of mind.'" Novis-Br.51 (quoting *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991)). By "happening of the event," Novis appears to mean the deception that Novis's mailings caused. *See id.*

This line of argument fails for at least two reasons. First, it relies on *Cardascia*, which is inapposite. That case involved a defendant who attempted to distance himself from the charged conspiracy by relying on

67

a resignation letter in which he had outlined certain "differences he [had] had" with his co-conspirator's previous loan practices. 951 F.2d at 482, 486. The letter was inadmissible hearsay because, as the district court found, it "was not the product of a contemporaneous state of mind," as required by Rule 803(3), but was "intended rather for use by the jury to infer a state of mind that had occurred six months earlier." *Id.* at 486, 487-88. That is not the case here, where the victims' statements reflected their contemporaneously held views of defendants' notices.

Second, the argument rests on a misunderstanding of what testimony is and is not admissible under Rule 803(3). The relevant inquiry here is whether the statement of belief is offered to "*prove the fact . . . believed*," Fed. R. Evid. 803(3) (emphasis added)—if it is, then the testimony is inadmissible. Thus, to run afoul of Rule 803(3)'s limitation, the government would have had to use the victims' statements to prove that what the victims believed was true—that they really had won large sums. The government took no such approach, considering that it was undisputed that defendants never actually awarding anyone money. Instead, consistent with Rule 803(3), the government offered these statements as evidence of the effect that the mailings had on each

68

victim's state of mind—to prove that the victims believed (incorrectly) that the prize notices were legitimate. That these statements also served as circumstantial evidence of defendants' fraudulent intent did not render the testimony inadmissible under Rule 803(3), because that inference did not entail any "pro[of] of the fact . . . believed." Fed. R. Evid. 803(3).

Insofar as Novis contends that the statements were also inadmissible because they were offered to prove "what [the defendant] or someone else had done in the past," he is mistaken. Novis-Br.49 (quoting *United States v. Lawal*, 736 F.2d 5, 8 (2d Cir. 1984)). To be sure, testimony that "sp[eaks] to a past act," rather than a then-existing state of mind, would not be admissible under Rule 803(3). *Shepard v. United States*, 290 U.S. 96 (1933). Thus, in *Shepard*, a woman's deathbed statement accusing her husband of poisoning her was inadmissible because it was offered "as proof of an act committed by [Dr. Shepard]" rather than proof of the victim's "present thoughts and feelings." *Id.* at 103-04, 106. That was not the case here, as the government did not seek to use the victims' statements that they had won the lottery to prove that defendants were actually awarding any of them prize money. *Lawal*

69

likewise does not aid Novis's cause, as that case concerned statements that did "reflect[] Lawal's present state of mind"—his "anger" and his "inten[t] to cooperate with the government agents"—which "would have been admissible under Rule 803(3)." 736 F.2d at 8-9. So too here: the victims' statements that they believed they had won a large cash prize reflected their state of mind and fit well within the parameters of the exception.

### D.  In The Alternative, Any Error Was Harmless.

Even if the district court erred in admitting the testimony, the error was harmless. "Not every hearsay error requires a new trial." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010). This Court weighs several factors "in determining whether the wrongful admission of evidence constitute harmless error," including: (1) "the overall strength of the prosecutor's case," (2) "the prosecutor's conduct with respect to the improperly admitted evidence," (3) "the importance of the wrongly admitted testimony," and (4) "whether such evidence was cumulative of other properly admitted evidence." *Id.* (quotations omitted). These factors all favor the government.

70

As explained above, the government's case against defendants was strong, and the disputed testimony represented only a small fraction of the inculpatory evidence of defendants' fraud. *See supra*, pp. 29-34 (summarizing the evidence of defendants' intent). The disputed testimony was also consistent with testimony given by two victims who testified at trial.

## V. The District Court's Admission Of Certain Correspondence To And From State Attorneys General Did Not Violate, Plainly Or Otherwise, The Confrontation Clause.

Novis contends (Br.52-55) that the district court violated his rights under the Confrontation Clause by admitting "letters and consumer complaints, including to [state] attorneys general," concerning defendants' mailings.[6] Apart from one exhibit containing certain letters and complaints to and from Ohio's Office of the Attorney General,

---

[6] Insofar as Novis also claims that some of this evidence pertaining to complaints received by other companies was inadmissible under Fed. R. Evid. 403, *see* Br.53 (contending that admission of the complaints "substantially more prejudicial than probative"), that argument is undeveloped and therefore waived, *see Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012). It is also incorrect: these complaints were found in defendants' offices and were therefore probative to establish notice, as explained *infra*, pp. 76-78. Insofar as Denkberg joins Novis's arguments regarding the correspondence evidence, the government's responses are equally applicable.

71

however, Novis does not specifically identify any other letters or complaints he believes were admitted in error, referring instead only to ranges from the trial transcripts. *See* Novis-Br.53-54. Whether Novis seeks to challenge all or some of these letters and complaints, his contentions are without merit.

### A. Factual Background.

Prior to trial, the government provided notice of its intent to offer, among other things, "letters from state attorneys general," as well as "other complaints and notes from or concerning victims," Dkt.No. 51, all of which had been obtained from a search of defendants' shared office or email accounts. *See* Tr.1129. Some of the complaints were handwritten letters from victims asking defendants for the prize money that was promised, *see, e.g.*, Ex.479, at 6 (note from customer stating that the payment of "$1,200,000 . . . never happened" and that the customer will "be expecting the check"), or notes from victims' relatives notifying the authorities that the victims were elderly and infirm and had fallen prey to defendants' fraudulent notices, *see, e.g.*, Ex.381, at 23-25 (handwritten complaint submitted to Ohio's Office of the Attorney General, which was, in turn, mailed to defendants, *see id.* at 21-22). Other correspondence

included letters from state attorneys general that referenced and attached consumer complaints against defendants' businesses and other sweepstakes scams. *E.g.*, Ex.325, 381, 383. The government explained that it was not "offer[ing] such documents to prove the truth of their contents" but rather "for the non-hearsay purpose of establishing [Novis and Denkberg's] intent to defraud, knowledge, and lack of good faith." Dkt.No. 51, at 18.

Novis objected "to the admission of any complaints by the alleged victims to the authorities." Dkt.No. 60. He contended that that the complaints were "self-serving, highly inflammatory, and not necessarily factually correct" and "refer[red] to promotions and frauds that have absolutely no connection to [Novis]." *Id.* He further stated that he would be "unable to cross-examine either the letters or the authors of these letters and complaints." *Id.* Denkberg's counsel did not raise any pre-trial objections to these documents.

The district court issued an order, stating that it would "address [Novis's concerns] on a complaint-by-complaint basis." Dkt.No. 63, at 3. Ultimately, however, the parties stipulated that these documents were authentic business records under Fed. R. Evid. 803(6). Dkt.No. 66, at 1.

73

Notwithstanding this stipulation, at trial, Novis re-raised his hearsay objection to some—but not all—of the complaints or letters offered by the government. *Compare, e.g.*, Tr.1214 (stating "No objection" to a letter from Maryland's Office of the Attorney General); Tr.1232 (same with respect to a complaint submitted to the North Dakota's Office of the Attorney General), *with, e.g.*, Tr.1219-21 (objecting to letters from Ohio's Office of the Attorney General). What objections he did make, the district court overruled. *E.g.*, Tr.1219-21. The court explained that the evidence was "relevant on notice, and . . . the more notice [Novis and Denkberg] got, . . . the more arguably compelling it is that they had all this notice." Tr.1243.

At defendants' request, the court agreed to give the jury limiting instructions regarding the evidence, thrice instructing:

> [T]hese documents are coming into evidence solely for the purpose of showing that the defendants were on notice of the contents of these documents. The truth and falsity of the assertions and claims in these documents are not to be considered by you.

Tr.1253; *see also* Tr.1179-80, 1139-40 (similar).

## B. Standard of Review.

Whether admission of a statement violates the Confrontation Clause is a legal question that is reviewed de novo. *E.g.*, *United States v. Sutton*, 337 F.3d 792, 798 (7th Cir. 2003). Although this Court reviews preserved challenges to evidentiary rulings for abuse of discretion, unpreserved challenges are subject to plain-error review. *United States v. Cedeño*, 756 F. App'x 24, 27-28 (2d Cir. 2018).

Novis contends (Br.47 n.16) that he preserved his Confrontation Clause objection because he mentioned his inability to cross-examine witnesses when objecting to some of the evidence below. *See* Dkt.No. 60. But that general lament was insufficient to put the court and government counsel on notice that Novis was raising a Confrontation Clause claim. Contrary to his contention (Br.47 n.16), the district court did not "recognize" that Novis had raised Confrontation Clause "concerns"; the court merely noted in one of its limiting instructions that counsel was not able to cross-examine the declarants. Tr.1139-40. Accordingly, this Court's review is for plain error.[7]

---

[7] This is equally true with respect to those letters and complaints to which Novis affirmatively declined to object.

75

**C.    The District Court Properly Admitted This Evidence To Show Notice.**

1.    The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The Confrontation Clause, however, "does not bar the use of testimonial statements for purposes *other* than establishing the truth of the matter asserted." *Id.* at 59 n.9 (emphasis added).

2.    That principle resolves Novis's claim. Even assuming the letters and complaints were plainly testimonial (which is neither plain nor obvious), the evidence did not implicate Novis's Confrontation Clause rights because, as the district court correctly explained, this evidence was admitted only to show notice and was not used to establish the truth of the matter asserted. This Court has "repeatedly held that a statement is not hearsay where, as here, it is offered[] not for its truth, but to show that a listener was put on notice." *United States v. Dupree*, 706 F.3d 131,

76

137 (2d Cir. 2013). Thus, "[e]vidence of customer complaints may be introduced to show the defendant's culpable state of mind, . . . and when so used, they are not considered to prove the truth of the matter asserted in the statement." *Moseley*, 980 F.3d at 27 (quotations omitted); *Press*, 336 F.2d at 1011. The district court's limiting instructions directing jurors to consider the documents only as evidence of notice (and not for their truth) placed the documents outside the scope of the Confrontation Clause.

3. Novis does not engage in this analysis at all. He simply contends not all letters pertained to defendants' businesses and that any such letters were therefore "completely immaterial to . . . notice." Novis-Br.53. He is mistaken. As an initial matter, the vast majority of letters and complaints admitted at trial were directed at defendants' companies, and all of the correspondence introduced at trial was either seized from defendants' shared offices or found during a search of their emails. That defendants also possessed complaints lodged against *other* companies

77

engaged in similar operations only underscores defendants' knowledge that their scheme—and schemes like it—were unlawfully deceptive.[8]

In any event, Novis cannot demonstrate that the admission of the correspondence affected his substantial rights. The evidence was similar to other evidence already presented to the jury, including other consumer complaints and the evidence regarding the 2012 investigation into defendants' activities by the U.S. Postal Inspection Service. And the district court's limiting instructions mitigated any risk that the jury may consider the evidence for its truth. Novis faults the district court for failing to reiterate its limiting instruction during the final jury charge or in a supplemental charge, (Br.53), but he failed to request such an instruction or otherwise object to the district court's instructions on these grounds. He makes no attempt to explain why the district court's instructions were plainly erroneous in this regard.

---

[8] Novis contends in passing that the government "could have simply admitted evidence establishing that complaints were made without admitting the contents of the complaints," Novis Br.53 n.17, but the government was not required to prove its case in such a fashion, and the district court did not clearly abuse its discretion by permitting the correspondence to be admitted into evidence.

78

## VI. The District Court Did Not Abuse Its Discretion In Excluding Evidence That Was Subject To An Ongoing Protective Order.

Denkberg contends (Br.52-58) that the district court erred by excluding evidence that he claims was exculpatory with respect to the aiding and abetting counts (Counts 16-19). He is incorrect.

### A. Background

As part of an investigation into defendants' connection to Phillips, Priolo, and Jeffrey Novis, the U.S. Postal Inspection Service conducted a search of email accounts associated with Phillips's, Priolo's, and Jeffrey Novis's sweepstakes report businesses and obtained thousands of email communications that it shared with the prosecution in this case. Dkt.43, at 2; Tr.1373-74, 1398. Because these emails potentially included attorney-client communications over which Phillips, Priolo, and Jeffrey Novis may assert privilege, the government assigned a filter team to segregate out any such communications before government trial counsel could access them. *See* Tr.1344; Dkt.44. The government also requested that the court enter a protective order pursuant to Fed. R. Evid. 502(d) so that the government could expeditiously provide all of the emails to defense counsel in accordance with its obligations under Fed. R. Crim. P.

16(a) and *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Dkt.43. Defendants did not oppose such an order. *Id.* at 3 n.1.

On November 15, 2021, the district court entered a protective order, directing the government filter team to provide defendants with all of the emails obtained as a result of the search and prohibiting defendants from disclosing those same emails to third parties. Dkt.44, at 1. The court also prohibited defendants from disclosing the emails to government trial counsel "unless the Court approves such disclosure on motion filed at least 21 days in advance of trial." Dkt.44, at 2. Among other things, this 21-day pre-trial notice requirement ensured that, if defendants wanted to introduce some of the potentially privileged materials at trial, the government would have sufficient time to review the remainder and prepare any rebuttal evidence. *See* Tr.1365-66.

At the time the order was entered, trial was slated for January 2022. *See* Dkt.42. It was subsequently continued to April 2022. *See* Tr.1349. At no time prior to either trial date did defendants notify the court or government that it planned to introduce any of the emails that were the subject of the court's protective order.

80

On May 8, 2022, two weeks after trial had begun and near the end of the government's case, defense counsel notified the government for the first time that it intended to introduce a binder containing "hundreds of emails" between PacNet's compliance department and Phillips, Jeffrey Novis, and Priolo regarding the language of their mailings, as well as emails of a similar nature between Phillips, Jeffrey Novis, Priolo and their lawyers. Tr.1346-47. These emails were subject to the court's ongoing protective order and potentially privileged, so government trial counsel could not review them at that time.

The government objected to the documents being introduced at trial on the ground that defendants had failed to provide the 21 days' notice required by the court's earlier order. *See* Tr.1344. When asked by the court why he did not comply with the notice requirement, Denkberg's counsel stated that issuance of the protective order "was a long time ago," and he appeared to suggest that he did not believe he needed to comply with the notice requirement because he thought it was no longer in effect after the date of trial was postponed. *See* Tr.1360-61. He also stated that he had "no reason" to believe that the government had not yet completed its privilege review of the other documents and thus no need to provide

notice. *Id.* He finally stated that he "made a mistake" and that he "didn't get to it in time." Tr.1363, 1369.

The district court reviewed the documents and denied the defendants' request. The court stated that defendants were seeking to "put[] in a select group of documents from a much larger universe of documents on the last day of the government's case" and characterized this conduct as "sandbagging." Tr.1361, 1365. The court explained that defendants' failure to comply with the 21-day notice provision prevented the government from "review[ing] the rest of the documents [to see] if there were documents [it] wanted to put in in response to [the defense's] proposed documents." Tr.1365-66.

Defendants revisited the issue the following day. In a letter to the court, Denkberg's counsel stated that he had "beg[u]n [his] review of the voluminous documents in preparation for the defense case over the weekend," which explained why he was so late to inform the government of his intent to offer the emails. *See* Dkt.86, at 2. The court reiterated its denial of defendants' request, stating that the parties "wouldn't be in this situation[] if [defendants] had just complied with the court order." Tr.1404. The court later clarified that the "basis" for its decision to

exclude the emails was its finding that defendants "were sandbagging [the government]."[9]  Tr.1739.

As an alternative to excluding the evidence, the court offered to "sever[] the aiding and abetting counts" and "try[] them . . . in front of another jury" so that the government would "have time to look at all these [other] documents" that may be "responsive" to the smaller subset that defendants wanted to admit.  Tr.1403.  Defendants declined the court's offer to sever the aiding and abetting counts.  *Id.*

## B.    Standard Of Review

A district court's decision to preclude the introduction of certain evidence as a sanction for a defendant's failure to comply with the court's rules is reviewable for abuse of discretion.  *E.g.*, *Noble v. Kelly*, 246 F.3d 93, 100-01 (2d Cir. 2001) (per curiam).

## C.    The District Court Did Not Abuse Its Substantial Discretion When Precluding The Introduction Of Certain Documents Because Of Counsel's Failure To Follow A Court-Ordered Notice Requirement.

1.    Although defendants have a Sixth Amendment right to "put before a jury evidence that might influence the determination of guilt,"

---

[9] The court subsequently issued a written order echoing its reasons for excluding the evidence.  *See* Dkt.129.

*Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987), this right is not without limits. It does not, for example, grant "[t]he accused . . . an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Nor does it permit a defendant to "present[] what might [be] a half-truth"—derived from "truncated portion[s]" of evidence "favorable to [the defendant]." *United States v. Nobles*, 422 U.S. 225, 241 (1975). Rather, a defendant's right to present evidence in his defense must be balanced against the "integrity of the adversary process," which in turn "depends . . . on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Taylor*, 484 U.S. at 414-15. Accordingly, the government's "interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." *Id.* at 411.

Courts enjoy broad discretion in enforcing those rules. *See Taylor*, 484 U.S. at 415-16. For example, a court may grant a continuance or

84

mistrial or preclude the proffered evidence altogether.  *See id.*  Especially if a defendant's failure to comply with the court's requirements is "willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," excluding the evidence "would be entirely consistent with the purposes of the [Sixth Amendment's] Compulsory Process Clause."  *Id.* at 415.

2.  In light of these principles, the district court properly exercised its discretion by enforcing the notice requirement in its order. Defendants sought to introduce a smaller subset of a large body of emails that related to Phillips's, Priolo's, and Jeffrey Novis's schemes. Defendants' failure to comply with the court's notice provision, coupled with their desire to admit only a "truncated portion" of the emails obtained during the search, would have deprived the government of its opportunity to respond to the defense evidence and risked presenting only a "half-truth" about this evidence to the jury.  *Nobles*, 422 U.S. at 241; *see also Taylor*, 484 U.S. at 414-15 (considering "the potential prejudice to the truth-determining function of the trial process").  The district court did not abuse its discretion when it recognized as much.

The prejudice to the government could not, as Denkberg now suggests (Denkberg-Br.54), be "minimized with relative ease." *Noble*, 246 F.3d at 100 n.3. Denkberg provided the government with the emails he sought to introduce on the *last day* of the government's case in chief. By that point, trial had been underway for two weeks. Any sanction would have been onerous. Even so, defendants rejected the court's generous proposal to sever the aiding and abetting counts, even though that proposal might have allowed defendants to present the evidence at a time when the government was permitted to see it and prepared to rebut it. Under these circumstances, the district court did not abuse its discretion when it determined that precluding the emails was appropriate.

3. Relying on *Noble*, Denkberg contends that the district court erred by excluding the emails "without finding a *willful* failure to comply with the twenty-one day notice provision." Denkberg-Br.54-55. But this Court has never held that willfulness is a prerequisite to preclusion. Indeed, in *Noble*, the Court declined to "decide whether, and to what extent, a finding of willfulness is required in every case." 246 F.3d at 100 n.3.

86

In any event, the district court did describe Denkberg's counsel's behavior as willful.  The court stated that it had "no reason to believe that [counsel's failure to provide notice] was anything other than sandbagging," Tr.1361, and later emphasized that the "basis" for its excluding the emails "was that [counsel was] sandbagging [the government], because if [counsel] put the documents in . . . now," the government "can't really rebut [them] because [its] never seen the universe of documents," Tr.1739.  Thus, even assuming willfulness is required, the district court found that counsel's behavior was deliberately tactical, and preclusion was therefore appropriate.  *See Taylor*, 484 U.S. at 415.

4.    Even if the district court did abuse its ample discretion in precluding the emails, any such error was harmless.  Denkberg stresses that the emails were "exculpatory" and went to "the heart . . . of the defense case."  Denkberg-Br.57 (quotations omitted).  But this argument is hard to square with defendants' refusal to accept the district court's offer to sever the aiding and abetting counts.  Such a severance would have allowed sufficient time to confer with third parties regarding any privileged materials that defendants and the government might

87

introduce. And it may well have ameliorated any concerns of prejudice to the government. If the emails were indeed so central to the defense, it is hard to understand why defendants declined the opportunity to present them in a separate trial on the aiding and abetting charges.

In any event, Denkberg overstates the strength of the emails and the effect they may have had on the jury's consideration of the aiding and abetting counts. As explained below, *see infra*, pp. 92-93, these emails were not particularly exculpatory. Many of them were also cumulative of evidence already presented—namely, that the defendants knew that PacNet's compliance team was reviewing Phillips, Priolo, and Jeffrey Novis's prize notices. *See* Denkberg-Br.52 (acknowledging such evidence). Under these circumstances, Denkberg can hardly claim that their exclusion "interfered with [his] constitutional right to present a defense." Denkberg-Br.58.

## VII. The Court Should Decline To Reach Denkberg's Ineffective Assistance Of Counsel Claim, Which Is, In Any Event, Without Merit.

Denkberg also contends that, even if the district court's enforcement of the 21-day notice requirement was not an abuse of discretion, Denkberg's counsel was ineffective in failing to comply with

88

the court's order.  Br.58-60.  The Court should decline to address this argument on direct appeal or, alternatively, reject it.

## A.    Standard of Review.

This Court "review[s] ineffective assistance of counsel claims *de novo*." *United States v. Kaid*, 502 F.3d 43, 45 (2d Cir. 2007) (per curiam).

## B.    The Court Should Decline To Address Denkberg's Ineffective Assistance Of Counsel Claim On Direct Appeal.

This Court has repeatedly expressed its "baseline aversion to resolving ineffectiveness claims on direct review," *United States v. Williams*, 205 F.3d 23, 35 (2d Cir. 2000) (quotations omitted), generally declining to do so unless "resolution is beyond any doubt," *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (quotations omitted).  But "[t]his Court may, in its discretion, entertain [such claims] on direct appeal in a narrow category of cases where . . . the defendant has a new counsel on appeal" and "argues no ground of ineffectiveness that is not fully developed in the trial record."  *Williams*, 205 F.3d at 35 (quotations omitted); *see also United States v. Oladimeji*, 463 F.3d 152, 154 (2d Cir. 2006).

This case is not the rare exception where this Court should address an ineffective-assistance-of-counsel claim on direct review.  Instead,

89

Denkberg's claim is best resolved in a 28 U.S.C. § 2255 motion. The record is not beyond doubt as to the reasons for counsel's failure to comply with the 21-day notice deadline. Although Denkberg contends that his attorney's behavior can be chalked up to "simple inadvertence" (Br.59), the district court characterized counsel's behavior as "sandbagging"—an attempt to prevent the government from "rebut[ting]" the documents "because [it has] never seen the universe of documents." Tr.1739. Further factual development in a Section 2255 proceeding would permit a more thorough examination of counsel's performance and allow the government the opportunity to explain in more detail why the evidence is not in fact exculpatory.

## C. If The Court Does Reach The Claim, It Should Deny It.

If this Court were to reach Denkberg's ineffective-assistance claim, the claim fails on the merits. To prevail, Denkberg "must show both (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different." *Best*, 219 F.3d at 201; *see also Strickland v. Washington,* 466 U.S. 668, 687-96 (1984). Denkberg cannot do so on the existing record.

90

1. To begin, he cannot show that his attorney's performance was objectively unreasonable absent further factual development. Below, Denkberg's counsel offered several explanations for his failure to comply with the court's order. He suggested that he did not believe he needed to comply with the notice requirement because he thought it was no longer in effect after trial was postponed. *See* Tr.1361; Dkt.86, at 2. He stated that he had "no reason" to believe that the government had not yet completed its privilege review of the other documents and thus no need to provide notice. *Id.* He also stated that he ran out of time to review the emails before trial. Tr.1369. At least on this record, these explanations cannot be considered unreasonable, particularly counsel's explanation that he "didn't get to it in time," *id.*, given the sheer volume of individual documents produced to the defense in this case—eight million, by the government's estimate, *see* Tr.1374.

2. In any event, even assuming counsel were deficient in his performance, Denkberg cannot demonstrate prejudice. As explained above, overwhelming evidence demonstrated Denkberg's guilt on the aiding and abetting counts. *See supra*, pp. 92-93. Indeed, although Denkberg characterizes the emails as "exculpatory," Br.59, the emails

91

pertaining to PacNet's compliance review do little more than establish facts that were already largely in the record. *See, e.g.*, Tr.297. And while the emails also indicate that Phillips, Priolo, and Jeffrey Novis sought their attorneys' advice, Denkberg cannot show that the jury would have treated this advice-of-counsel argument any differently than defendants' own advice-of-counsel defense, which the jury rejected.

This is especially true given that many of the emails were considerably inculpatory. ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████    ███████████████████████████████████

██████████████████████████████████████████

████████████████████

        ████████████████████████████████████

████████████████████████████    █████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



In light of the inculpatory nature of these emails, alongside other evidence demonstrating Denkberg's efforts to aid and abet Phillips, Priolo, and Jeffrey Novis, *see supra*, pp. 39-46, Denkberg cannot show a likelihood that the jury's verdict would have been different even if the emails had been presented to the jury.

# CONCLUSION

The Court should affirm Novis's and Denkberg's convictions.

Respectfully submitted,

AMANDA N. LISKAMM
Director

JOSEPH M. WILLIAMS
Assistant Director

CHARLES B. DUNN
CAROLYN F. RICE
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
 General

LISA H. MILLER
Deputy Assistant Attorney General

/s/ *Amanda L. Mundell*
AMANDA L. MUNDELL
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 305-4491
Amanda.Mundell@usdoj.gov

MAY 13, 2024

94

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2024, the foregoing redacted page proof brief was filed via ACMS with this Court and served via ACMS on all registered filers, including counsel for defendants-appellants.


/s/ Amanda L. Mundell
Amanda L. Mundell
Criminal Division, Appellate Section
U.S. Department of Justice

## <u>CERTIFICATE OF COMPLIANCE</u>

This redacted page proof brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as extended by this Court's order. This brief contains 17,965 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

/s/ Amanda L. Mundell

Amanda L. Mundell
Criminal Division, Appellate Section
U.S. Department of Justice
